UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven M. SELF, Defendant–Appellant.

No. 92–4111.

United States Court of Appeals,
Tenth Circuit.

Aug. 24, 1993.

Christopher Harris of McCutchen, Doyle, Brown & Enersen, Washington, DC (William F. Hughes of Howrey & Simon, Washington, DC, with him on the brief), for defendant-appellant.

J. Carol Williams, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC (David J. Jordan, U.S. Atty., and Gordon W. Campbell, Asst. U.S. Atty., Salt Lake City, UT, Myles E. Flint, Acting Asst. Atty. Gen., and David C. Shilton, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, with her on the brief), for plaintiff-appellee.

Before LOGAN, SEYMOUR and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Defendant Steven M. Self appeals his convictions on four counts of violating the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(d), one count of mail fraud, 18 U.S.C. § 1341, and one count of conspiracy to violate RCRA, the Clean Air Act ("CAA"), and the Clean Water Act ("CWA"). 18 U.S.C. § 371. Three of the four substantive RCRA counts (counts 2, 3 and 4) and the mail fraud count (count 7) relate to the diversion of a shipment of natural gas condensate destined for a hazardous waste treatment, storage and disposal facility to a gas station, blending it with gasoline and selling it to the public as automotive fuel. The remaining substantive RCRA count (count 8) relates to the storage of twenty-nine drums of waste material in violation of a RCRA permit. The conspiracy count (count 1) relates to the activity supporting the other counts as well as unpermitted burning of waste and unpermitted dumping of waste water. Defendant raises a number of issues on appeal, and we have jurisdiction under 28 U.S.C. § 1291.

I.

The record reveals the following facts. In 1981, Defendant and Steven Miller formed EkoTek, Inc. Defendant provided most of the capital and became an 85% shareholder and EkoTek's President. Miller held the remaining 15% of the stock and became Vice–President. EkoTek purchased an industrial facility in Salt Lake City, Utah. Us-

ing Miller's technical expertise, EkoTek began re-refining used oil into marketable products. Defendant and Miller managed EkoTek on a day-to-day basis with Defendant primarily responsible for the financial aspects of the business, and Miller primarily responsible for the technical aspects.

The facility purchased by EkoTek was an authorized RCRA interim status treatment, storage and disposal facility. *See* 42 U.S.C. § 6925(e)(1). In 1981 and again in 1982, Defendant signed and submitted an updated part A RCRA permit application. *See* 40 C.F.R. § 270.13 (1992). In 1983, Defendant signed and submitted a part B RCRA permit application. *See id.* § 270.14. By submitting the permit applications, EkoTek could continue operating as a treatment, storage and disposal facility under RCRA interim status, pending its RCRA permit approval. *See* 42 U.S.C. § 6925(e)(1). In November 1986, EkoTek began marketing itself as a hazardous waste recycling facility. Defendant and Miller prepared a letter and sent it to hazardous waste brokers and generators which indicated that EkoTek was licensed and prepared to accept a variety of hazardous wastes for recycling at its facility.

In April 1987, a representative of Southern California Gas Company ("SCGC"), met with Miller at EkoTek and discussed EkoTek disposing of SCGC's natural gas pipeline condensate. The parties agreed that the condensate was hazardous waste and should, therefore, be transported and handled under a RCRA manifest. Miller indicated that EkoTek could dispose of the natural gas condensate by burning it as fuel in EkoTek's onsite process heaters or boilers. SCGC subsequently contracted with and agreed to pay EkoTek "to transport, burn, and/or dispose of" natural gas condensate for $2.50 per gallon.

Shortly thereafter, an EkoTek tanker truck driver picked up a shipment of natural gas condensate from a SCGC facility in Los Angeles, California. The driver had been instructed by his supervisor to pick up the shipment and bring it back to EkoTek. As was his routine practice, the driver stopped at a gas station in Barstow, California, which was owned by Defendant, and telephoned his supervisor. On instructions from Defendant, the supervisor told the driver to leave the trailers containing the natural gas condensate at the gas station and return to Los Angeles to pick up an unrelated shipment. Defendant telephoned the gas station manager and instructed him to blend the natural gas condensate with gasoline in a 5-10% mixture and add an octane booster. The gasoline and condensate mixture was then sold to the public as automotive fuel. On Defendant's instructions, Miller told EkoTek's Refinery Operations Manager to sign the manifest to indicate that the natural gas condensate shipment had been received at EkoTek and to falsify EkoTek's operating log accordingly. A copy of the manifest was mailed to SCGC.

In early 1987, EkoTek began receiving fifty-five gallon drums of waste material from different sources. Defendant instructed an employee to store the drums in the south warehouse. When the south warehouse filled up, Defendant instructed the employee to store the drums in the east warehouse. The employee was also instructed by his immediate supervisor to scrape the "hazardous waste" label off of each drum, paint a number on the drum, and list it on an inventory sheet. In July 1987, the State of Utah, pursuant to its delegated RCRA authority, *see* 42 U.S.C. § 6926(b), granted EkoTek a RCRA permit which prohibited EkoTek from storing hazardous waste in the east warehouse. Defendant discussed this illegal storage practice with Miller. Defendant's office at EkoTek had a view of the doors to the east warehouse which were usually left open and through which stored fifty-five gallon drums were visible. On several occasions, Defendant ordered the doors to the east warehouse closed after being informed that inspectors would be at the facility.

Among the drums stored in the east warehouse were seventeen drums of waste from Avery Label and twelve drums of waste from Reynolds Metals both of which were shipped to EkoTek under RCRA manifests identifying the materials as hazardous wastes. Avery Label's manager of safety and environmental affairs testified that the waste sent to EkoTek was a mixture of ultraviolet

curer ink waste, solvent ink waste, and cleaning solvent. Ultraviolet curer ink has a flash point exceeding 200° F and is, therefore, not considered hazardous due to ignitability. *See* 40 C.F.R. § 261.21(a) (1992). Solvent ink, on the other hand, has a flash point well below 140° F and is, therefore, considered hazardous due to ignitability. *See id.* The Material Safety Data Sheets ("MSDS") for the type of solvent inks that Avery Label used in 1987 indicated that the solvent inks had a flash point of between 16° F and 116° F. According to the Avery Label representative, mixing solvent ink waste with ultraviolet curer ink waste does not raise the flash point because the vapors of the solvent ink waste, which determine its ignitability, rise to the top. In his opinion, the waste sent to Eko-Tek had a flash point of between 70° F to 100° F. The hazardous waste broker who had arranged for the disposal of the Avery Label waste personally observed the waste sent to EkoTek and recognized it as a solvent-based ink due to its smell.

The RCRA manifest which accompanied the shipment of the Reynolds Metals waste to EkoTek indicated that the material was a mixture of "MEK" (methyl ethyl ketone) and a spray residue. MEK is a listed hazardous waste, *see* 40 C.F.R. § 261.33(f) (1992), and it has a flash point of 23° F. The spray residue has a flash point of 100° F.

In April 1988, the hazardous waste broker responsible for shipping both the Avery Label and Reynolds Metals wastes to EkoTek visited the EkoTek facility after having been informed that drums of waste which he brokered had never been processed and were being illegally stored at the facility. By this time, EkoTek was no longer in business, and Petro Chemical Recycling, with which Defendant had no affiliation, had taken over operation of the facility. The broker observed "a lot of drums" being stored in the east warehouse, none of which were labeled but were crudely marked with a number. Using Eko-Tek's inventory sheet and recognizing the drums by their distinctive color, the broker identified the seventeen drums of Avery Label waste and the twelve drums of Reynolds Metals waste. He subsequently arranged for Marine Shale Processors to dispose of these as well as several other drums of waste. On documentation submitted to Marine Shale Processors, the broker indicated that the materials were from four types of waste streams, and he identified the material in twenty-four of the 128 barrels as "UV ink waste." Marine Shale Processors tested a sample from each of the four types of waste streams and determined that each type of identified waste had a flash point below 70° F.

## II.

With regard to the substantive RCRA counts and the mail fraud count relating to the diversion of the natural gas condensate to the Barstow gas station (counts 2, 3, 4 and 7), Defendant argues that natural gas condensate, when burned for energy recovery, is not a hazardous waste subject to regulation under RCRA. Therefore, Defendant claims the district court erred by denying Defendant's pretrial motion to dismiss, by denying Defendant's motion for a judgment of acquittal, and in its instruction to the jury defining hazardous waste. Because this issue is a question of law, our review is de novo. *United States v. Deffenbaugh Indus., Inc.*, 957 F.2d 749, 751 (10th Cir.1992).

## A.

RCRA defines "hazardous waste," in relevant part as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may ... pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5)(B). Natural gas condensate is a relatively volatile substance, having a flash point of less than 140° F and, therefore, is "hazardous" as contemplated by RCRA. *See* 40 C.F.R. §§ 261.3(a)(2)(i), 261.21(a)(1) (1992). Nonetheless, "for a waste to be classified as hazardous, it must first qualify as a solid waste under RCRA." *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1313 (2d Cir. 1993) (citing *United Technologies Corp. v. EPA*, 821 F.2d 714, 716 n. 1 (D.C.Cir.1987)).

*See also United States v. Dean,* 969 F.2d 187, 194 (6th Cir.1992), *cert. denied,* ——— U.S. ———, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993); *American Mining Congress v. EPA,* 824 F.2d 1177, 1179 (D.C.Cir.1987).

RCRA defines "solid waste" to include "any ... discarded material, including ... liquid ... material resulting from industrial, commercial, mining, and agricultural operations, and from community activities...."[1] 42 U.S.C. § 6903(27). RCRA regulations narrow the definition of "solid waste" to "any discarded material that is not excluded by § 261.4(a) or that is not excluded by a variance granted under §§ 260.30 and 260.31." 40 C.F.R. § 261.2(a)(1) (1992). As there is no contention that natural gas condensate is subject to the § 261.4(a) exclusion, or that it has been granted a variance under § 260.30 and 260.31, whether natural gas condensate is a solid waste turns on whether it is a discarded material.

RCRA regulations define "discarded material" to include material which is "[a]ban-

doned" or "[r]ecycled."[2] *Id.* § 261.2(a)(2). A material is abandoned, inter alia, by being "[b]urned or incinerated."[3] *Id.* § 261.2(b)(2). A material is recycled, inter alia, by being "[b]urn[ed] for energy recovery" or "[u]sed to produce a fuel or are otherwise contained in fuels."[4] *Id.* § 261.2(c)(2). Any material that is abandoned by being burned or incinerated is considered a solid waste. *See id.* § 261.2(b). However, we note only certain types of materials that are recycled by being burned for energy recovery are considered solid wastes. *See id.* § 261.2(c). *See also American Mining,* 824 F.2d at 1180 ("EPA determines whether a material is a RCRA solid waste when it is recycled by examining both the material or substance itself and the recycling activity involved.").

The only type of material which is considered solid waste when it is recycled by being burned for energy recovery and which might encompass natural gas condensate is a "[b]yproduct exhibiting a characteristic of hazardous waste."[5] *See* 40 C.F.R. § 261.2 (Table

1. RCRA also defines "solid waste" to include "any garbage, refuse, [and] sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility...." 42 U.S.C. § 6903(27). There is no contention that natural gas condensate is any of these types of materials.

2. The regulations also define "discarded material" to include "any material which is ... [c]onsidered inherently wastelike." 40 C.F.R. § 261.2(a)(2)(iii) (1992). It is undisputed that natural gas condensate is not an inherently wastelike material.

3. A material is also abandoned if it is "[d]isposed of," 40 C.F.R. § 261.2(b)(1) (1992), or "[a]ccumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated." *Id.* § 261.2(b)(3). The determination of whether a material is a solid waste by virtue of being disposed of leads us in circles in that the statutory and regulatory definitions of "disposal" depend in part on whether the material is a solid waste. *See* 42 U.S.C. § 6903(3); 40 C.F.R. § 260.10 (1992); *see also Reading Co. v. City of Philadelphia,* 823 F.Supp. 1218, 1235–37 (E.D.Pa.1993); *Zands v. Nelson,* 779 F.Supp. 1254, 1261–62 (S.D.Cal. 1991). Nevertheless, it is undisputed that Defendant did not cause the natural gas condensate to be "discharge[d], deposit[ed], inject[ed], dump[ed], spill[ed], leak[ed], or plac[ed] ... into or on any land or water." *See* 42 U.S.C. § 6903(3); 40 C.F.R. § 260.10 (1992). Therefore, Defendant did not dispose of the natural gas condensate. Similarly, there is no contention

that the natural gas condensate was "[a]ccumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated." *Id.* § 261.2(b)(3).

4. The regulations also consider certain materials recycled when the material is "[u]sed in a manner constituting disposal," 40 C.F.R. § 261.2(c)(1) (1992), "[r]eclaimed," *id.* § 261.2(c)(3), or "[a]ccumulated speculatively." *Id.* § 261.2(c)(4). It is undisputed that the natural gas condensate was not used in a manner constituting disposal, *see supra* note 3, reclaimed, *see* 40 C.F.R. § 261.1(c)(4) (1992), or accumulated speculatively, *see id.* § 261.1(c)(8).

5. The remaining types of materials which, when they are recycled by being burned for energy recovery, are considered solid wastes are "[s]pent materials," listed or characteristic "[s]ludges," listed "[b]y-products," listed "[c]ommercial chemical products," and "[s]crap metal." 40 C.F.R. § 261.2 (Table 1) (1992). Natural gas condensate is clearly not a spent material, sludge, or scrap metal as defined by the regulations. *See id.* § 261.1(c)(1) (defining "spent material" as "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing"); *id.* § 260.10 (defining "sludge" as "any solid, semi-solid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, or air pollution control facility exclusive of the treated effluent from

1) (1992). As noted earlier, natural gas condensate exhibits the ignitability characteristic of hazardous waste; thus, the issue turns on whether natural gas condensate is a "by-product" as defined by RCRA regulations. RCRA regulations define "by-product" as "a material that is not one of the primary products of a production process and is not solely or separately produced by the production process" exclusive of "co-product[s]." 40 C.F.R. § 261.1(c)(3) (1992). While RCRA's definition of "by-product" is certainly subject to reasonable interpretation, the EPA directly addressed the issue of whether natural gas condensate is a by-product in its 1985 comment to its current regulatory definition of "solid waste":

> Off-specification fuels burned for energy recovery ... are not by-products, and so would not be considered to be wastes under this provision. An example [is] natural gas pipeline condensate. The condensate contains many of the same hydrocarbons found in liquefied natural gas, and certain higher hydrocarbons that also have energy value. It is generated in the pipeline transmission of natural gas. This condensate is not considered to be waste when burned for energy recovery.[6]

50 Fed.Reg. 630 n. 18 (Jan. 4, 1985). Relying on this EPA statement, Defendant argues that so long as natural gas condensate is burned for energy recovery, it is not a by-product and, therefore, not a discarded material by virtue of being recycled, and, therefore, not a solid waste, and, therefore, not a hazardous waste under RCRA.

The government argued below and continues to argue on appeal that natural gas condensate is hazardous waste if it is used in a manner which was not the original intended manner or normal intended use for that material within the industry.[7] In support of this argument, the government first directs us to the EPA's long-standing distinction between legitimate and sham burning for energy recovery. See 50 Fed.Reg. 630 (Jan. 4, 1985); 48 Fed.Reg. 14,482 (Apr. 4, 1983); 48 Fed.Reg. 11,157–58 (Mar. 16, 1983); 45 Fed. Reg. 33,093 (May 19, 1980). The government then points to an EPA comment stating that commercial chemical products when burned for energy recovery are considered solid wastes because this is a manner of recycling which differs from their normal manner of use. See 50 Fed.Reg. 618 (Jan. 4, 1985). Next, the government relies on an EPA statement that the status of "non-listed commercial chemical products ... would be the same as those listed in § 261.33—[t]hat is, they are not considered solid wastes when recycled except when they are recycled in ways that differ from their normal manner of use." 50 Fed.Reg. 14,216, 14,219 (Apr. 11, 1985).

By focusing on the EPA distinction between legitimate and sham burning for energy recovery, the government appears to be arguing that the natural gas condensate was not recycled within the meaning of the regulations and, therefore, was abandoned by being burned or incinerated. This distinction would undermine Defendant's argument be-

---

a wastewater treatment plant"); id. § 261.1(c)(6) (defining "scrap metal" as "bits and pieces of metal parts ... which when worn or superfluous can be recycled"). Moreover, the government, in this case, has never relied on, nor does it direct us to, anything in the regulations indicating that natural gas condensate is either a *listed* commercial chemical product, see id. 261.33, or a *listed* by-product, see id. §§ 261.31, 261.32.

**6.** In its 1983 proposed rule defining "solid waste," only listed by-products were considered solid wastes when recycled. See 48 Fed.Reg. 14,481 (Figure 4) (Apr. 4, 1983); see also 50 Fed.Reg. 629 (Jan. 4, 1985). However, the 1985 final rule "determined that *all* by-products ... are solid wastes when burned as fuels or used to produce a fuel." 50 Fed.Reg. 629 (Jan. 4, 1985). In adopting this final rule, the EPA stated that

by-products are "unlike commercial fuels" and are "significantly different in composition from fossil fuels." Id. Distinguishing between by-products and fossil fuels, the EPA noted that by-products "are waste-like because they are residual materials containing toxic constituents not ordinarily found in fossil fuels." Id. It was in this context that the EPA singled out natural gas condensate as an example of an off-specification fuel that is not a by-product. Id. at 630 n. 18.

**7.** At the government's request, the district court gave an instruction defining hazardous waste in this manner. At trial, the government offered expert testimony that natural gas condensate does not have a normal intended use within the petroleum industry, and the district court did not allow Defendant to present expert testimony to the contrary.

cause any abandoned material is considered solid waste. *See* 40 C.F.R. § 261.2(b) (1992). On the other hand, by focusing on the EPA's rationale for classifying commercial chemical products which are burned for energy recovery as solid waste, the government's argument also suggests that natural gas condensate is a non-listed commercial chemical product, *see generally supra* note 5, and, therefore, must be recycled in a normal manner in order to not be considered a hazardous waste. This argument would also undermine Defendant's argument because recycling commercial chemical products by burning them for energy recovery is not a normal manner of use and, therefore, the natural gas condensate, to the extent it is a commercial chemical product, is a solid waste. The government does not distinguish between these two alternative arguments but rather collapses the EPA's distinction between legitimate and sham burning for energy recovery with the EPA's rationale for classifying commercial chemical products which are burned for energy recovery as solid wastes. In doing so, the government combines otherwise unrelated EPA comments concerning distinct provisions within the regulatory definition of "solid waste" and misapplies these EPA comments to the facts of this case, as we discuss below.

### 1.

The legitimate versus sham distinction first arose in 1980 when the EPA defined "solid waste" to include "materials which have served their original intended purpose and are sometimes discarded." 45 Fed.Reg. 33,093 (May 19, 1980). *See also* 48 Fed.Reg. 14,475 (Apr. 4, 1983). Under this definition, "virtually all ... secondary materials" were considered solid wastes. 50 Fed.Reg. 618 (Jan. 4, 1985). However, the EPA exempted from regulation all recycling activity and the transportation and storage of non-sludges and non-listed hazardous waste which were recycled, *see* 48 Fed.Reg. 11,157 (Mar. 16, 1983); 45 Fed.Reg. 33,105 (May 19, 1980), and recognized that "burning of hazardous wastes as fuels can be a type of recycling activity exempted from regulation." 48 Fed. Reg. 11, 157–58 (Mar. 16, 1983). Expressing concern about, inter alia, the "burning of

organic wastes that have little or no heat value in industrial boilers under the guise of energy recovery," 45 Fed.Reg. 33,093 (May 19, 1980), the EPA adopted a policy that in order to fall within the exemption, the burning must "constitute legitimate, and not sham, recycling." 48 Fed.Reg. 11,158 (Mar. 16, 1983); *see also* 45 Fed.Reg. 33,093 (May 19, 1980) (recognizing exemption as "temporary deferral" and noting that it "is confined to *bona fide* 'legitimate' and 'beneficial' uses and recycling of hazardous wastes").

In 1985, the EPA amended its regulatory definition of "solid waste" to substantially its present form which asks "both what a material is and how it is being recycled before knowing whether it is a solid waste." 50 Fed.Reg. 616 (Jan. 4, 1985). Following the 1985 amendment, the EPA's distinction between legitimate and sham burning became significant, not only by continuing to determine the applicability of the recycling exemption, but also by determining whether a material is being burned or incinerated—*i.e.* burned for destruction—and, therefore, abandoned, or is being burned for energy recovery and, therefore, recycled. *See id.* at 630.

Contrary to the government's argument, the EPA has never distinguished legitimate from sham burning for energy recovery based on whether the burning was the original intended use or normal manner of use of the material within the industry. The "primary" factor in distinguishing legitimate from sham burning for energy recovery is "the energy value of the hazardous waste being ... burned." 48 Fed.Reg. 11,158 (Mar. 16, 1983); *see also* 56 Fed.Reg. 7183 (Feb. 21, 1991) ("5,000 BTU/lb limit generally considered heretofore to be the minimum for a legitimate hazardous waste fuel"); 50 Fed. Reg. 630 (Jan. 4, 1985) ("burning of low energy hazardous wastes as alleged fuels is not considered to be burning for legitimate energy recovery"). As the EPA stated, "[i]f the wastes being burned have only de minimus energy value, the burning cannot recover sufficient energy to characterize the practice as legitimate recycling.... [T]he wastes, for practical purposes are being burned to be destroyed." 48 Fed.Reg. 11,-

158 (Mar. 10, 1983). Natural gas condensate has a relatively high energy value, and the government conceded at oral argument that the natural gas condensate could have been burned for legitimate energy recovery in the boiler or industrial furnace at EkoTek.[8]

The government's reliance on the EPA statement that commercial chemical products, when burned for energy recovery, are solid wastes because this manner of recycling differs from their normal manner of use is completely misplaced. In this statement, the EPA was not distinguishing legitimate from sham recycling methods. Rather, the EPA was explaining its rationale for classifying commercial chemical products as solid waste when they are recycled by being burned for energy recovery. Specifically, the EPA stated that

> Although [commercial chemical products] ... ordinarily are not wastes when recycled ... we are including them as wastes when they are recycled in ways that differ from their normal manner of use, namely, when they are used in a manner constituting disposal, or when they are burned for energy recovery (assuming these materials are neither a pesticide nor a commercial fuel).

50 Fed.Reg. 618 (Jan. 4, 1985) (internal citation omitted). This EPA comment merely explains why the EPA considers commercial chemical products which are legitimately recycled by being burned for energy recovery to be solid wastes even though commercial chemical products which are recycled by other methods, namely reclamation and speculative accumulation, are not considered solid wastes. *See* 40 C.F.R. § 261.2 (1992); *see also id.* § 261.33 (listed commercial chemical products are "hazardous wastes if and when ... in lieu of their original intended use, they are produced for use as (or as a component of) a fuel, distributed for use as a fuel, or burned as a fuel"). Indeed, it is implicit in this EPA statement of why commercial chemical products are solid wastes when burned for energy recovery that the commercial chemical product has been legitimately recycled. Contrary to the government's argument, this EPA comment has nothing to do with whether a particular manner of burning for energy recovery is legitimate or sham.

### 2.

Alternatively, the government suggests that natural gas condensate is a commercial chemical product (albeit an unlisted one), and, under the EPA's policy treating unlisted commercial chemical products like listed commercial chemical products, is a solid waste even if it is legitimately burned for

---

**8.** The EPA has recognized that the "nature of the device in which the wastes are being burned ... could be significant" to whether "particular burning operations are within the scope of the recycling exemption." *Id.* However, the question here is not whether the natural gas condensate was exempted from regulation as a "recyclable material," *see* 40 C.F.R. § 261.6(a)(2)(ii) (1992), but whether the natural gas condensate was a solid waste as defined under 40 C.F.R. § 261.2 (1992) and, therefore, subject to regulation in the first place. Section 261.6(a)(2)(ii), setting forth the recycling exemption, specifically limits the exemption to "[h]azardous wastes burned for energy recovery in boilers and industrial furnaces that are not regulated under subpart O of part 264 or 265 of this chapter...." *Id.* § 261.6(a)(2)(ii). Notably, § 261.2, which defines solid waste, does not require that material be burned in a boiler or industrial furnace to be burned for energy recovery and, therefore, recycled. Moreover, when the EPA noted that its 1983 sham recycling policy would control the question of whether a material was burned or incinerated and, therefore, abandoned or burned for energy recovery and, therefore, recycled, the EPA specifically characterized the policy as being based on the energy level of the waste being burned. *See* 50 Fed.Reg. 630 (Jan. 4, 1985).

> This is not to say that the nature of the device in which the material is burned is completely irrelevant to whether the material is recycled by being burned for energy recovery or abandoned by being burned or incinerated. High energy materials burned in an incinerator may not be considered to be recycled because an incinerator's capacity to retrieve the energy from the material is limited. Alternatively, low-energy materials burned in a boiler or industrial furnace may not be considered to be recycled due to their limited energy value. In either case, the EPA considers such materials to be burned for destruction. In this case however, we have a high energy material—natural gas condensate—burned in the internal combustion engines of automobiles. While some internal combustion engines are better than others at retrieving the energy value from fuel to power vehicles, no one can seriously argue that an internal combustion engine does not have the capacity to recover energy from fuel.

energy recovery. This argument fails for several reasons.

First, only listed commercial chemical products are considered solid wastes when burned to recover energy, *see* 40 C.F.R. § 261.2 (Table 1) (1992), and natural gas condensate is not listed. *See id.* § 261.33. We recognize that the EPA has stated that it is "implicit" in the statutory and regulatory scheme that the "status" of "non-listed commercial chemical products ... would be the same as those listed in § 261.33—[t]hat is, they are not considered solid wastes when recycled except when they are recycled in ways that differ from their normal manner of use." 50 Fed.Reg. 14,216, 14,219 (Apr. 11, 1985). However, such an implicit construction of the regulations is certainly not clear from the regulations themselves. To the contrary, the regulations define "commercial chemical products" by reference to a specific list of materials, *see* 40 C.F.R. § 261.33 (1992), which suggests that non-listed materials are not subject to regulation as commercial chemical products.

In addition to natural gas condensate not being listed as a commercial chemical product, the government's own expert testimony at trial belies the government's contention on appeal that natural gas condensate is a commercial chemical product. The EPA has defined "commercial chemical product" as "a chemical substance which is manufactured or formulated for commercial or manufacturing use which consists of the commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient." 40 C.F.R. § 261.33(d) (comment) (1992). The government's expert testified that natural gas condensate is an unintended by-product of the transportation of natural gas through pipelines. Notably, the government never asserted below that natural gas condensate was a commercial chemical product; rather, the government responded to Defendant's motion to dismiss by claiming that natural gas condensate "is a by-product of a manufacturing process." In light of the government expert's description of natural gas condensate and the government's contention below

that natural gas condensate is a by-product, the government cannot seriously argue that natural gas condensate is manufactured or formulated for commercial or manufacturing use.

The government's characterization of natural gas condensate as a commercial chemical product cannot be reconciled with other EPA interpretations of the regulatory definition of solid waste. Notably, the EPA stated that burning commercial chemical products for energy recovery is never the normal use of such products. 50 Fed.Reg. 618 (Jan. 4, 1985). Accordingly, commercial chemical products which are burned for energy recovery are always considered solid wastes. *See* 40 C.F.R. § 261.2 (Table 1) (1992). If natural gas condensate is a commercial chemical product, as the government's argument suggests, it would always be a solid waste when burned for energy recovery. Yet, this very same EPA comment cites natural gas condensate as an example of an off-specification fuel which is not considered to be a waste when burned for energy recovery. *Id.* at 630 n. 18. The EPA specifically qualified its statement that burning commercial chemical products for energy recovery is never their normal manner of use by "assuming [that] these materials are [not] a commercial fuel." *Id.* at 618. Thus, the government's construction is inconsistent with the EPA's interpretation.

Finally, to support its suggestion that natural gas condensate is an unlisted commercial chemical product, the government directs us to a 1991 EPA comment which characterizes natural gas condensate as an "off-specification commercial chemical product that has some BTU value." 56 Fed.Reg. 7184 (Feb. 21, 1991). In this comment, the EPA specifically stated that "if ignitable off-specification natural gas condensate is burned as motor fuel ... such material[ ] [is] solid and hazardous waste[ ] and subject to subtitle C controls ... because the mode of burning is not at all like these materials' original intended use." *Id.* According to the government, this statement "simply added further clarification to

the distinction already in the regulations and accompanying Federal Register notices." [9]

We do not read the 1991 comment as a mere clarification of an already existing EPA regulatory policy. For reasons already stated, the classification of natural gas condensate as an unlisted commercial chemical product is inconsistent with the EPA's earlier statement concerning the status of natural gas condensate. *See* 50 Fed.Reg. 630 n. 18 (Jan. 4, 1985). The 1991 comment clearly amended the EPA's policy with respect to natural gas condensate so as to bring Defendant's conduct within the purview of the regulatory scheme underlying the instant criminal charges. Given that the conduct at issue occurred in 1987, to permit the government to rely on the 1991 comment would run afoul of the Due Process Clause. *See Cox v. Louisiana*, 379 U.S. 559, 568–72, 85 S.Ct. 476, 482–85, 13 L.Ed.2d 487 (1965).

In short, other than a 1991 EPA comment which we view as inapplicable to this case because it substantively amended the EPA's interpretation of the regulations well after the date of the charged offense, the government's argument that natural gas condensate is a solid waste if it is "used in a manner which was not the original intended manner or normal intended use for that material within the industry" has no support in the statutory or regulatory scheme. On the other hand, Defendant's argument is consistent with the statutory and regulatory scheme, and is clearly supported by the EPA's statement that natural gas condensate when burned for energy recovery is not a solid waste. In light of this construction of the regulatory scheme by the EPA, we agree with Defendant that, under the EPA's interpretation of the regulations in effect as of

1987, natural gas condensate is not a hazardous waste subject to RCRA regulation when it is burned for energy recovery, which includes burning it as automotive fuel.[10]

### B.

■■■ Defendant claims that, because natural gas condensate burned for energy recovery is not a RCRA hazardous waste, counts 2, 3, 4 and 7 were "fatally defective as a matter of law" and "should have been dismissed before trial." We disagree. Each of these counts alleged that the natural gas condensate was a hazardous waste. Whether the natural gas condensate was a RCRA hazardous waste was dependant on the factual question of whether the natural gas condensate was burned for energy recovery. A district court may not resolve evidentiary issues on a motion to dismiss. *See United States v. Knox*, 396 U.S. 77, 83 n. 7, 90 S.Ct. 363, 367 n. 7, 24 L.Ed.2d 275 (1969); *United States v. Kilpatrick*, 821 F.2d 1456, 1462 n. 2 (10th Cir.1987), *aff'd sub nom. Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Therefore, the district court did not err in denying Defendant's pre-trial motion to dismiss these counts.

### C.

■■■ Defendant also argues that the district court erred by denying his motion for a judgment of acquittal on counts 2, 3, 4 and 7, due to the government's failure to prove that the natural gas condensate was RCRA hazardous waste. The government's theory at trial was that the natural gas condensate was

---

**9.** In the district court, Defendant sought to offer the testimony of Marcia Williams, former Director of the EPA's Office of Solid Waste, that this language was added to the 1991 comment at the behest of the prosecutors in this case and for the sole purpose of undermining the defense. Ms. Williams testimony was not offered, however, after the government agreed not to rely on the language in the 1991 comment. Although the government's argument on appeal does not directly rely on the 1991 comment, the government's claim that the 1991 comment "simply added further clarification to the distinction already in the regulations and accompanying Federal Register notices," indirectly relies on the

comment in an attempt to give credence to the government's otherwise meritless argument.

**10.** Defendant also argues that the government's construction of the statute and regulations fail to provide fair warning of criminal conduct, and SCGC and the industry generally treat natural gas condensate as a product rather than a waste. We construe both of these arguments as alternative grounds for reversal which Defendant raises in the event that we agree with the government's construction of the regulatory definition of solid waste. Because we agree with Defendant's construction of the statute and regulations, we do not address either of these arguments.

sold as automotive fuel—*i.e.* burned for energy recovery—and the government even presented evidence to this effect. There is no evidence in the record before us that the natural gas condensate was used or disposed of in any manner other than for energy recovery. In light of our reasoning that natural gas condensate is not a RCRA hazardous waste when burned for energy recovery, to the extent that counts 2, 3, 4 and 7 required the government to prove that the natural gas condensate was hazardous waste, the evidence is insufficient as a matter of law.

#### 1.

Count 2 charged a violation of 42 U.S.C. § 6928(d)(1) which prohibits "knowingly transport[ing] or caus[ing] to be transported *any hazardous waste* identified or listed under ... subchapter [III of RCRA] to a facility which does not have a permit...." (emphasis added). Clearly, this count required the government to prove that the natural gas condensate was a RCRA hazardous waste, and the district court instructed the jury to this effect. Because the government failed to prove that the natural gas condensate was a RCRA hazardous waste, the government's proof with respect to count 2 was insufficient as a matter of law.

#### 2.

■ Count 3 charged a violation of 42 U.S.C. § 6928(d)(3) which prohibits "knowingly ... mak[ing] any false material statement or representation in any ... record, report ... or other document filed, maintained, or used for purposes of compliance with [RCRA] regulations...." 42 U.S.C. § 6928(d)(3). The government relied upon the falsification of the manifest accompanying the natural gas condensate shipment to support count 3. The district court did not instruct the jury that it had to find that natural gas condensate was a hazardous waste to convict on this count, but did instruct the jury that the manifest is a "document[ ] used for purposes of compliance with applicable laws."

SCGC erroneously believed (which we understand) that the natural gas condensate was a hazardous waste and, therefore, prepared a manifest for the shipment. SCGC was only required to ship the natural gas condensate under a RCRA manifest if it was, in fact, hazardous waste. *See* 40 C.F.R. § 262.20(a) (1992) ("[a] generator who transports, or offers for transportation, hazardous waste for offsite treatment must prepare a [m]anifest"). Similarly, EkoTek was only required to ensure compliance with the manifest if the natural gas condensate was hazardous waste. *See id.* § 263.20(a) ("[a] transporter may not accept hazardous waste from a generator unless it is accompanied by a manifest"); *id.* § 265.71(a) (interim status treatment, storage and disposal facilities must certify receipt of "hazardous waste accompanied by a manifest"). Because the natural gas condensate was not a hazardous waste, the manifest was not required "for purposes of compliance with [RCRA] regulations." 42 U.S.C. § 6928(d)(3). Therefore, the government's failure to prove that natural gas condensate was a hazardous waste renders its proof on count 3 insufficient as a matter of law.

#### 3.

■ Count 4 was also charged under 42 U.S.C. § 6928(d)(3), and it was based on the falsification of EkoTek's operating log to indicate that the natural gas condensate had been received at EkoTek when, in fact, it had been diverted to the Barstow gas station. As an interim status treatment, storage, and disposal facility, EkoTek was required to keep a written operating log. *See* 40 C.F.R. § 265.73(a) (1992). Thus, unlike the manifest at issue in count 3, the operating log at issue in count 4 was a document "maintained ... for purposes of compliance with [RCRA] regulations." 42 U.S.C. § 6928(d)(3).

To convict Defendant under § 6928(d)(3), the government was required to prove that the false entry into EkoTek's operating log was "material." 42 U.S.C. § 6928(d)(3). Materiality is a question of law. *See Kungys v. United States*, 485 U.S. 759, 772, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988) (construing 8 U.S.C. § 1451(a)); *United States v. Harrod*, 981 F.2d 1171, 1176 (10th Cir.1992) (construing 18 U.S.C. § 1001), *cert. denied,* — U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259

(1993). For purposes of § 6928(d)(3), materiality depends on whether the statement or omission "will have a tendency to influence Agency action." H.R.Rep. No. 198, 98th Cong., 2d Sess. 55 (1983), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5614; *see also United States v. Brittain*, 931 F.2d 1413, 1415 (10th Cir.1991) (applying similar standard to 18 U.S.C. § 1001).

While EkoTek was required to keep an operating log, it was only required to record receipt of hazardous wastes in the log. *See* 40 C.F.R. § 265.73(b) (1992). However, whether the natural gas condensate was hazardous waste depended on how it was ultimately disposed, and regulatory authorities would not necessarily know that the natural gas condensate was to be burned for energy recovery and, therefore, not a hazardous waste. Indeed, SCGC treated the natural gas condensate as a RCRA hazardous waste, albeit erroneously, by accompanying the shipment with a RCRA manifest. Because of the false entry made in the EkoTek operating log, regulatory authorities may not have been alerted to an unaccounted for shipment of material with the potential to be hazardous waste thereby preventing an investigation into the matter. The false statement in the operating log concealed the actual disposition of the natural gas condensate and, therefore, had a tendency to forestall any regulatory agency investigation. Thus, the government's failure to prove that the natural gas condensate was hazardous waste does not render the false statement immaterial.[11]

### 4.

■ Count 7 charged a violation of 18 U.S.C. § 1341, which prohibits using the mail for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1341. While the elements of this crime certainly did not require the government to prove that the natural gas condensate was RCRA hazardous waste, the government's theory, as charged in the indictment, was that Defendant devised a scheme to defraud SCGC of money by contracting to "properly transport, store, treat and dispose of, *hazardous waste*" in consideration of payment by SCGC and then failing to provide for the proper transportation, storage, treatment, and disposal of the *hazardous waste*. The government's theory necessarily depended on proof that the natural gas condensate was hazardous waste. Accordingly, the evidence supporting count 7 is insufficient as a matter of law.[12]

### D.

■ With respect to counts 2, 3, 4 and 7 Defendant also claims that the district court's instruction to the jury concerning whether natural gas condensate was hazardous waste was erroneous, and that the district court erred by not allowing him to present expert testimony concerning the regulatory status of natural gas condensate in order to refute the government's expert. In light of our holding that counts 2, 3 and 7 must be reversed due to the government's failure to prove that the natural gas condensate was hazardous waste,

**11.** In *United States v. Radetsky*, 535 F.2d 556 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976), *overruled in part by United States v. Daily*, 921 F.2d 994, 1004 (10th Cir.1990), *cert. denied*, — U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991), we held that a physician's false claims for Medicare reimbursement were not "material" because the claims were for drugs that were not compensable under medicare and, therefore, were "incapable of inducing payments." 535 F.2d at 571. RCRA's regulatory scheme is very different from the Medicare scheme at issue in *Radetsky*. Unlike the drugs at issue in *Radetsky*, whether the natural gas condensate was subject to RCRA regulation was dependant on the ultimate disposition of the natural gas condensate, and Defendant, as

well as SCGC, treated the natural gas condensate as if it was within RCRA's regulatory authority. Thus, unlike the physician's false statement in *Radetsky*, Defendant's false statement here had a tendency to influence the agency's action.

**12.** Defendant also claims with respect to count 7 that the indictment failed to properly charge and the government failed to prove a deprivation of a tangible property right as required under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Given our holding that count 7 must be reversed due to insufficient evidence of the scheme to defraud as alleged in the indictment, we need not address this argument.

we address this argument only with respect to count 4.

■ As our earlier discussion indicates, the district court's instruction was erroneous because it defined natural gas condensate as hazardous waste unless used in its originally intended manner or in a manner normally intended in the industry. Moreover, in light of our construction of the regulatory definition of hazardous waste, there was no need for either the government or Defendant to present expert testimony concerning natural gas condensate's normal manner of use within the petroleum industry. Nonetheless, an erroneous jury instruction or an erroneous evidentiary ruling requires reversal only if the error is prejudicial. *See United States v. Caro,* 965 F.2d 1548, 1555 (10th Cir.1992) (jury instruction); *United States v. Jefferson,* 925 F.2d 1242, 1255 (10th Cir.) (evidentiary ruling), *cert. denied,* —— U.S. ——, 112 S.Ct. 238, 116 L.Ed.2d 194 (1991). *See generally* Fed.R.Crim.P. 52 ("[a]ny error ... which does not affect substantial rights shall be disregarded"). Given our earlier reasoning that count 4 did not require the government to prove that the natural gas condensate was hazardous waste, the district's court's erroneous instruction and any error in allowing the government's expert testimony did not prejudice Defendant.

### III.

Count 8 stems from the storage of the seventeen drums of Avery Label waste and the twelve drums of Reynolds Metals waste in the EkoTek's east warehouse. This count charged a violation of 42 U.S.C. § 6928(d)(2)(B) which prohibits "knowingly ... stor[ing] ... hazardous waste ... in knowing violation of any material condition or requirement of [a RCRA] permit." 42 U.S.C. § 6928(d)(2)(B). This count was also charged and the jury was instructed under an aiding and abetting theory. 18 U.S.C. § 2. On appeal, Defendant contends that the evidence was insufficient to prove that the material in the twenty-nine drums was haz-

ardous waste and that he possessed the requisite knowledge.[13] Defendant also contends that the jury instruction concerning knowledge was erroneous.

### A.

■ In reviewing the sufficiency of the evidence, we view the evidence in a light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Brittain,* 931 F.2d 1413, 1420 (10th Cir.1991). The jury may draw reasonable inferences from the proven facts, and credibility determinations are properly within the jury's province. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *United States v. Garcia,* 994 F.2d 1499, 1504 (10th Cir.1993).

### 1.

■ Count 8 required the government to prove that the material was hazardous waste identified or listed under subchapter III of RCRA. *See* 42 U.S.C. § 6928(d)(2)(B). RCRA regulations define "hazardous waste" as solid waste which either exhibits a characteristic of hazardous waste or is listed in the regulations.[14] 40 C.F.R. § 261.3 (1992). The government's theory at trial was that the Avery Label waste was characteristic waste because it had a flash point of less than 140° F, *see id.* § 261.21(a)(1), and that the Reynolds Metals waste was both characteristic waste due to its ignitability, *see id.,* and listed waste—*i.e.* MEK. *See id.* § 261.33(f).

Defendant's primary contention is that the government failed to present any reliable test data concerning the Avery Label or Reynolds Metals waste. As to the test results from Marine Shale Processors which indicated a flash point of below 140° F, Defendant accurately points out that they were not based on an EPA-approved test method

---

13. It is undisputed that EkoTek's RCRA permit did not authorize it to store hazardous waste in the east warehouse and that this is a material condition of the permit.

14. Unlike Defendant's argument with respect to the natural gas condensate, there is no dispute that these substances were solid wastes as defined under 40 C.F.R. § 261.2 (1992).

for ignitability [15] and the samples were taken from a composite of the material sent to it by the broker. Defendant also notes that the test results from Marine Shale Processors describe the Reynolds Metals material as "paint" and as a liquefied mixture containing water and MEK, while the manifest that originally accompanied the Reynolds Metals waste described the material as "non-pumpable sludge." Defendant points to evidence of a test conducted in February 1988 by Gray Laboratories which indicated that the spray material contained in the Reynolds Metals waste had a flash point of 179° F. Finally, with respect to the Avery Label waste, Defendant points to a document prepared in April 1988 by the broker in which he refers to the material as "UV ink waste" and a Waste Profile Sheet for "waste ink" prepared by an Avery Label employee which indicates a flash point of 150° F.

■ While an EPA-approved test of the material would have been persuasive evidence as to whether the material was hazardous waste, the government was not required to prove this element through test data. *See United States v. Baytank, Inc.,* 934 F.2d 599, 614 (5th Cir.1991) (evidence was sufficient to prove drums contained hazardous waste even though the government took no drum samples). Moreover, whether the material tested by Gray was the same material in the Reynolds Metals waste was contested at trial as the government presented test results for the spray material which indicated that it had a flash point of 100° F. *See United States v. Dee,* 912 F.2d 741, 746 (4th Cir. 1990) (defendant's test results indicating that material had flash point exceeding 140° F were not conclusive as there was evidence of irregularity of testing procedure), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991). Regardless of the flash point of the Reynolds Metals waste, there was evidence that it contained MEK which is

a listed hazardous waste.[16] *See United States v. MacDonald & Watson Waste Oil Co.,* 933 F.2d 35, 41 (1st Cir.1991) (fact that soil was contaminated with non-hazardous chemicals in addition to listed hazardous waste would not render soil non-hazardous waste). Further, the fact that the broker referred to the Avery Label waste as "UV waste ink," and an Avery Label employee conducted a test on some unknown "waste ink" which indicated a flash point of 150° F does not render the government's evidence insufficient as a matter of law. *See United States v. Greer,* 850 F.2d 1447, 1452 (11th Cir.1988) (evidence was sufficient for jury to find that material was listed hazardous waste despite manifest indicating that the material was "waste solvent"). In short, the absence of reliable test data and presence of some conflicting evidence in the record does not render the government's proof insufficient as a matter of law.

The government proved that the material was hazardous waste through the testimony of the Avery Label and Reynolds Metals representatives and the hazardous waste broker. Both representatives identified the manifests which indicated that the materials were hazardous wastes. The Reynolds Metals representative testified that the waste included MEK which is a hazardous waste regardless of its ignitability when combined with other materials. The Avery Label representative identified the specific composition of the waste as solvent ink, ultraviolet curer ink and cleaning solvent. The Material Data Safety Sheets for solvent inks used by Avery Labels in 1987 indicated a flash point of well below 140° F. *See Dee,* 912 F.2d at 746–47 (evidence was sufficient for jury to find that material was characteristic hazardous waste where Material Safety Data Sheet and another document prepared by defendant indicated a flash point of below 140° F). Moreover, the Avery Label representative testified that the fact that it was mixed with the relatively

15. RCRA's definition of ignitable characteristic waste, with respect to liquid, is based on whether the waste has a flash point of less than 140° F "as determined by a Pensky–Martens Closed Cup Tester ... or a Setaflash Closed Cup Tester ... or as determined by an equivalent test method approved by the Administrator...." 40 C.F.R. § 261.21(a)(1) (1992).

16. Defendant's own witness who performed the test on the spray material admitted that, if it were mixed with MEK, it would have a "very low flash point."

involatile ultraviolet curer ink would have little effect on the waste material's ignitability. The broker testified that he recognized the Avery Label waste as solvent ink due to its smell. This evidence is sufficient for a reasonable jury to find that the material at issue in count 8 was RCRA hazardous waste. *See Baytank,* 934 F.2d at 614 ("documents, including drum inventories, a hazardous waste log, and internal memoranda, as well as the testimony at trial, all amply demonstrate" that drums contained hazardous waste); *Greer,* 850 F.2d at 1452 (bill of lading identifying material as listed waste, testimony that material smelled like waste, and evidence that traces of the chemical had been found at the dump site was sufficient for the jury to find that the material was the listed hazardous waste). The fact that there may have been other conflicting evidence does not render the evidence insufficient as the jury's very function is to resolve conflicting evidence.

2.

■■■ Defendant also claims that the evidence was insufficient to establish that he had the requisite knowledge for a criminal violation under § 6928(d)(3). Specifically, Defendant argues that there was no evidence that he knew the twenty-nine drums of Avery Label and Reynolds Metals waste were stored in the east warehouse or that they contained RCRA hazardous waste, nor did the evidence show that he knew that storage of these wastes in the east warehouse violated EkoTek's RCRA permit.

There was substantial evidence that Defendant knew hazardous waste was being stored in the east warehouse in violation of EkoTek's RCRA permit. Testimony from both Miller and the EkoTek employee responsible for unloading and storing drums of hazardous waste and keeping the inventory clearly established that Defendant directed the storage of hazardous waste in the east warehouse. Miller also testified that he specifically discussed this illegal storage practice with Defendant. Defendant signed the RCRA permit applications which did not seek authorization to store hazardous waste in the east warehouse. Furthermore, in a

RCRA criminal prosecution, "[t]he government may prove guilty knowledge by circumstantial evidence." *United States v. Hayes Int'l Corp.,* 786 F.2d 1499, 1504 (11th Cir. 1986). *See also United States v. Speach,* 968 F.2d 795, 797 (9th Cir.1992). In the present case, Defendant was responsible for the day-to-day management of EkoTek and oversaw all the bills. There was evidence that Defendant helped prepare the letter soliciting hazardous waste from generators and brokers and that from his office he could see drums of waste being stored in the east warehouse. Moreover, testimony established that Defendant ordered the doors closed, and in one instance assisted in closing the doors to the east warehouse after being informed that inspectors were visiting EkoTek. *See United States v. Morehead,* 959 F.2d 1489, 1503 (evidence that defendant attempted to evade police supported inference of defendant's knowledge of illegal activity), *aff'd sub nom. United States v. Hill,* 971 F.2d 1461 (10th Cir.1992) (en banc). This evidence is sufficient to prove that Defendant knew hazardous waste was being stored in the east warehouse and knew that such storage violated EkoTek's RCRA permit.

■■■ Nevertheless, Defendant argues that the evidence is insufficient for the jury to infer that Defendant knew of the east warehouse storage of the specific twenty-nine drums at issue in count 8. Defendant relies on the First Circuit's language in *Mac-Donald & Watson,* to support his claim that the evidence regarding his knowledge of the specific twenty-nine drums was insufficient. In *MacDonald & Watson,* the court recognized that "[s]imply because a responsible corporate officer believed that on a prior occasion illegal transportation occurred, he did not necessarily possess knowledge of the violation charged." 933 F.2d at 55. However, the *MacDonald & Watson* court was not addressing the sufficiency of the evidence. Rather, the court was addressing the propriety of a particular jury instruction which allowed the jury to find that the defendant had the requisite knowledge of the illegal transportation of hazardous waste solely by virtue of his position as a responsible corporate officer. *Id.* at 50–55. While the *Mac-Donald & Watson* court reversed a convic-

tion for knowingly transporting hazardous waste to an unpermitted facility because of the erroneous "responsible corporate officer" instruction, the court expressly recognized in a RCRA criminal prosecution that "knowledge may be inferred from circumstantial evidence, including position and responsibility of defendants ... as well as information provided to those defendants on prior occasions." *Id.* at 55. *Accord United States v. Johnson & Towers, Inc.,* 741 F.2d 662, 670 (3d Cir.1984) ("knowledge" in a RCRA criminal prosecution "may be inferred by the jury as to those individuals who hold the requisite responsible positions with the corporate defendant"), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985). Thus, while knowledge of prior illegal activity is not conclusive as to whether a defendant possessed the requisite knowledge of later illegal activity, it most certainly provides circumstantial evidence of the defendant's later knowledge from which the jury may draw the necessary inference. *Cf.* Fed.R.Evid. 404(b) (prior bad act evidence admissible to prove knowledge).

In *Greer,* the Eleventh Circuit held that the evidence was sufficient to prove that the defendant knowingly disposed of hazardous waste despite the fact that there was no evidence that the defendant told his employee to dump the particular load of hazardous waste at issue. 850 F.2d at 1451–52. Rather, the evidence showed that the defendant told the employee to "handle" the load of waste, and the defendant had approved of dumping the waste in the past. *Id.* Similarly, in *Dee,* the Fourth Circuit held that evidence that the defendant was in charge of operations at the facility, had originally ordered hazardous waste to be stored in an unpermitted area of the facility, and repeatedly ignored warnings about the hazardous condition of the materials and the improper storage yet took no action to comply with the RCRA was sufficient to show that Defendant directed the illegal storage. 912 F.2d at 747.

In our view, the evidence in this case was sufficient for the jury to infer that Defendant knew of the storage of the Avery Label and Reynolds Metals waste in the east warehouse and knew that such storage violated Eko-Tek's RCRA permit. There was direct evidence that Defendant had knowledge of prior illegal storage, and Defendant directed his employee to store hazardous waste in the east warehouse. The jury could infer from Defendant's overseeing of the bills that he knew about the particular waste at issue in count 8. Certainly, the government may "prove a defendant had actual knowledge of a material and operative fact by proving deliberate acts committed by the defendant from which actual knowledge can be logically inferred." *United States v. Uresti–Hernandez,* 968 F.2d 1042, 1046 (10th Cir.1992); *see, e.g., United States v. Langston,* 970 F.2d 692, 706 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992); *cf. United States v. Ochoa–Fabian,* 935 F.2d 1139, 1141–42 (10th Cir.1991) (approving of deliberate ignorance instruction which permits jury to infer guilty knowledge based on proof "beyond a reasonable doubt of a conscious purpose to avoid enlightenment"), *cert. denied,* — U.S. —, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

 Even if we were not convinced that there was sufficient evidence for the jury to infer that Defendant actually knew about the illegal storage of the Avery Label and Reynolds Metals waste, we can affirm Defendant's conviction on an alternative ground. Defendant overlooks the fact that count 8 was charged, and the jury was instructed, under an aiding and abetting theory, and the jury was also instructed on a *Pinkerton* theory. *See Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) (criminal conspirator is criminally responsible for substantive crimes of coconspirators committed during the course of and in furtherance of the conspiracy which are reasonably foreseeable). *See also United States v. Russell,* 963 F.2d 1320, 1322 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992). Defendant's conviction on count 8 can be alternatively affirmed under either of these theories.

To prove that Defendant aided and abetted the illegal storage charged in count 8, the government is required to prove that someone committed the underlying substantive

offense, *Langston,* 970 F.2d at 705 n. 12; *United States v. Rodgers,* 419 F.2d 1315, 1317 (10th Cir.1969), and that Defendant "share[d] in the intent to commit the offense ... [and] participated in some manner to assist its commission." *United States v. Smith,* 838 F.2d 436, 441 (10th Cir.1988) (citing *United States v. Fischel,* 686 F.2d 1082, 1087 (5th Cir.1982)), *cert. denied,* 490 U.S. 1036, 109 S.Ct. 1935, 104 L.Ed.2d 407 (1989). Miller admitted at trial that EkoTek received the waste from Avery Label and Reynolds Metals, and that he understood it to be "manifested hazardous waste." Miller further admitted that it was EkoTek's standard practice at this time to store drums of hazardous waste in the east warehouse. Testimony from an EkoTek employee established that Miller, like Defendant, had specifically directed the employee to store hazardous waste in the east warehouse. Finally, Miller admitted knowing that storage of hazardous waste in the east warehouse violated EkoTek's RCRA permit. This evidence is sufficient to establish that Miller violated § 6928(d)(2)(B) by storing the Avery Label and Reynolds Metals waste in the east warehouse. Defendant's direction to his employee to store hazardous waste in the east warehouse and his specific discussion with Miller about the illegality of this practice is sufficient evidence to establish that Defendant shared the requisite intent. Moreover, Defendant participated in the offense, not only by directing the illegal storage, but by personally attempting to avoid its detection by the inspectors. Thus, regardless of whether the evidence would be sufficient for the jury to infer that Defendant had knowledge of the illegal storage of the twenty-nine drums at issue in count 8, the evidence is abundantly sufficient to find that Defendant aided and abetted Miller's commission of the offense.

The evidence of Miller's commission of the substantive offense also supports Defendant's conviction under a *Pinkerton* theory. The indictment clearly indicated that Miller was a coconspirator, albeit an unindicted one, and clearly charged that the illegal storage of hazardous waste in the east warehouse as an object of the conspiracy. Defendant does not even challenge on appeal the sufficiency of the evidence to support his conspiracy con-

viction. Accordingly, given that Miller's acts relating to the storage of the Avery Label and Reynolds Metals waste were in the course of and in furtherance of the conspiracy, Defendant can be held criminally responsible for these acts.

### B.

■ Defendant also claims that the district court's jury instruction concerning Defendant's knowledge that the material was hazardous waste was erroneous. The district court instructed the jury as follows:

> That on or about the dates alleged in the Indictment, the defendant knowingly stored or commanded and caused others to store hazardous waste. The defendant need have no specific knowledge of the particular hazardous characteristics of the material in question, only that it was hazardous waste and not a benign or innocuous material such as water.

Defendant objected to this instruction claiming that the instruction should require the jury to find that Defendant knew the waste was an identified or listed hazardous waste under RCRA. Defendant reasserts this same argument before us.

■ We review the propriety of tendering an individual jury instruction de novo. *United States v. Harmon,* 996 F.2d 256, 257 (10th Cir.1993) (citations omitted). We examine the jury instructions as a whole to determine whether the jury was provided with an accurate statement of the applicable law. *Id.* (citations omitted). We will only reverse a conviction due to an erroneous instruction if the error was prejudicial when viewed in light of the entire record. *United States v. Caro,* 965 F.2d 1548, 1555 (10th Cir.1992).

Defendant points to the language of the statute which proscribes *"knowingly ... stor[ing] ...* any hazardous waste identified or listed under this subchapter ... in *knowing* violation of any material condition or requirement of [a RCRA] permit." 42 U.S.C. § 6928(d)(2)(B) (emphasis added). According to Defendant, because the statute expressly requires knowledge that the storage violates the permit, and the permit only

regulates RCRA hazardous waste, the statute necessarily requires proof of the defendant's knowledge that the material is hazardous waste identified or listed under RCRA.

Whether 42 U.S.C. § 6928(d)(2)(B) requires proof that the defendant knew the substance at issue was identified or listed hazardous waste under RCRA appears to be an issue of first impression. However, several circuits have given narrower constructions of the knowing requirement in other RCRA criminal provisions. The Fourth, Fifth and Eleventh Circuits have held that § 6928(d)(2)(A), which prohibits knowingly treating, storing or disposing of hazardous waste without a permit, does not require proof of the defendant's knowledge that the materials are listed or identified as hazardous waste under RCRA regulations. *See United States v. Goldsmith*, 978 F.2d 643, 645 (11th Cir.1992); *Baytank*, 934 F.2d at 613; *Dee*, 912 F.2d at 745. Similarly, the Eleventh Circuit has also held that § 6928(d)(1), which prohibits knowingly transporting hazardous waste to an unpermitted facility, does not require proof of the defendant's knowledge that the material was hazardous waste within the meaning of RCRA regulations. *See Goldsmith*, 978 F.2d at 645; *Hayes*, 786 F.2d at 1503. These circuits, as well as the Third and Ninth Circuits in the context of § 6928(d)(2)(A), have held that the government need only prove that Defendant knew the material was hazardous in that it was potentially harmful to persons or the environment. *See Goldsmith*, 978 F.2d at 646; *Baytank*, 934 F.2d at 613; *Dee*, 912 F.2d at 745; *United States v. Hoflin*, 880 F.2d 1033, 1039 (9th Cir.1989), *cert. denied*, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990); *Greer*, 850 F.2d at 1450; *Johnson & Towers*, 741 F.2d at 666 (construing § 6928(d)(2)(A)).

These courts have generally relied on the Supreme Court's reasoning in *United States v. International Minerals & Chem. Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). *International Minerals* involved a prosecution under 18 U.S.C. § 834(f) (repealed 1979) for knowingly violating an Interstate Commerce Commission regulation which required shipping papers to describe hazardous materials. The defendant argued that, because he was not aware of the particular regulation, he could not have knowingly violated it as required under the terms of the criminal statute. *Id.* at 560, 91 S.Ct. at 1699. The Court held that the defendant's lack of knowledge of the regulation was no defense. *See id.* at 562, 91 S.Ct. at 1700. ("[t]he Act ... does not signal an exception to the rule that ignorance of the law is no excuse"). The Court reasoned that "where ... obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565, 91 S.Ct. at 1701–02. Courts which have applied *International Minerals'* reasoning to the knowing requirement of RCRA's criminal provisions have generally reasoned that persons dealing with materials, which by their very nature are potentially dangerous, are presumed to know the regulatory status of the material, *see United States v. Sellers*, 926 F.2d 410, 416 (5th Cir.1991); *Dee*, 912 F.2d at 745, or that to permit a defendant to claim that he or she did not know the material was identified or listed as a RCRA hazardous waste would effectively approve of a mistake of law defense which is generally not viable in a criminal prosecution. *See Baytank*, 934 F.2d at 612; *Dee*, 912 F.2d at 745.

Notwithstanding *International Minerals'* reasoning and the application of this reasoning to the knowing requirement of RCRA's criminal provisions by every circuit that has addressed the issue, Defendant argues that we should follow the Supreme Court's reasoning in *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). In *Liparota*, the Supreme Court held that 7 U.S.C. § 2024(b)(1), which prohibited the knowing acquisition or possession of food stamps in any manner not authorized by the statute or regulations, required proof, not only of the defendant's knowledge of his acquisition or possession of the food stamps, but also of the defendant's knowledge that his possession or acquisition of the food stamps was not authorized by the regulation. *Id.* at 425, 105 S.Ct. at 2088; *accord United States v. O'Brien*, 686 F.2d 850, 853 (10th Cir.1982). *Liparota* does not control this

case. The *Liparota* Court distinguished *International Minerals* because the statute at issue in *Liparota* did not involve "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health and safety." 471 U.S. at 433, 105 S.Ct. at 2092. Given that RCRA is a public welfare statute which was designed "to protect human health and the environment," *see* 42 U.S.C. § 6924(a) (West Supp.1993); *United States v. Colorado,* 990 F.2d 1565, 1569–70 (10th Cir.1993), the *Liparota* Court's reasoning, in light of its recognized distinction of *International Minerals,* is inapposite. *See Baytank,* 934 F.2d at 613; *Hayes,* 786 F.2d at 1503.

We recognize that § 6928(d)(2)(B) requires proof that the storage was "in knowing violation" of the RCRA permit, and the RCRA permit only governs storage of RCRA hazardous waste. We do not believe, however, that this particular knowing requirement makes knowledge of the regulatory status of the material a prerequisite to conviction under § 6928(d)(2)(B). Rather, the second "knowing" requirement of § 6928(d)(2)(B) ensures that a good faith belief that a permit allows a particular manner of treatment, storage or disposal of hazardous waste, when in fact it does not, is a defense to a criminal charge. *See* H.R.Conf.Rep. No. 1444, 96th Cong., 2d Sess. 37 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5019, 5036 ("This section is intended to prevent abuses of the permit system by those who obtain and then knowingly disregard them.") It does not eliminate the presumption, applicable to every other RCRA criminal provision and to regulatory statutes in general which concern dangerous substances, that persons handling such materials know of their regulatory status. Accordingly, Defendant's claim that the district court should have instructed the jury that it must find that Defendant knew the material at issue in count 8 was identified or listed as hazardous waste under RCRA regulations is not persuasive.

On appeal, Defendant broadens his contention that the instruction was erroneous by arguing, not only that the instruction failed to require the government to prove that De-

fendant knew the material was RCRA hazardous waste, but also that it allowed the jury to convict merely by finding that Defendant knew the material was "not a benign or innocuous material such as water." Because Defendant did not raise this particular objection below, we review only for plain error. *See Sellers,* 926 F.2d at 417.

While the government was not required to prove that Defendant knew that the material was identified or listed as hazardous waste under RCRA regulations, the government was required to prove that Defendant knew the material was hazardous in that it had the potential to be harmful to persons or the environment. *See Goldsmith,* 978 F.2d at 645–46; *Baytank,* 934 F.2d at 613; *Hoflin,* 880 F.2d at 1039; *Greer,* 850 F.2d at 1450. Here, the district court's instruction specifically required the jury to find that Defendant knew the material was hazardous. However, the instruction did not define hazardous as having the potential to harm other persons or the environment, but merely told the jury that it meant a non-benign or non-innocuous material, and gave water as an example of a benign or innocuous material.

█ The Eleventh and Ninth Circuits have approved of an instruction regarding knowledge which requires the jury to find that "the defendant knew that the stored material had the potential to be harmful to others or to the environment, in other words, that it was not an innocuous substance like water." *See Goldsmith,* 978 F.2d at 645; *Hoflin,* 880 F.2d at 1039. While we agree with this instruction and find it preferable to the instruction given in this case, the instruction here was not an erroneous statement of the law. The instruction specifically required the jury to find that Defendant knew the material was hazardous waste. Thus, it is unlike the erroneous instruction in *Dee* which required the jury to find only that Defendant knew the materials were chemicals without also requiring a finding that Defendant knew the materials were hazardous. 912 F.2d at 745. As a result, even though the instruction in this case may have been incomplete by failing to inform the jury that Defendant must know the material had the potential to be harmful to others or the

environment, this omission was not so obvious as to rise to the level of plain error. *See Sellers,* 926 F.2d at 417 (no plain error in failing to instruct the jury that the government was required to prove that the defendant knew that the substance he disposed of was potentially hazardous or dangerous to persons or the environment).

### IV.

■ Finally, Defendant argues that his conviction on count 1 for conspiracy to violate CAA, RCRA and CWA must be set aside because the verdict may have been based upon a legally insufficient overt act or means. Count 1 charged Defendant with conspiring with EkoTek, Inc. and other unidentified co-conspirators (1) to violate CAA, specifically 42 U.S.C. § 7413(c)(1), by burning solvents, used oil and hazardous waste in violation of EkoTek's state air permit; (2) to violate RCRA, specifically 42 U.S.C. §§ 6928(d)(1), 6928(d)(2), 6928(d)(3), by storing the Avery Label and Reynolds Metals waste in unpermitted areas of the facility, by transporting the natural gas condensate to an unpermitted facility and falsifying the manifest and the operating log, and by illegally storing and treating 5,000 gallons of corrosive waste in March 1987; and (3) to violate the CWA, specifically 33 U.S.C. §§ 1317(d), 1319(c)(1), 1319(c)(2), by discharging pollutants from the EkoTek facility into the public sewer system. We have already determined that the government's theory with respect to the natural gas condensate charges was erroneous, and, therefore, the government failed to meet its burden of proof with respect to two of the four substantive RCRA counts. Additionally, the district court granted Defendant's motion for a judgement of acquittal with respect to substantive counts which related to the improper storage and treatment of the corrosive wastes. Defendant claims on appeal that because the jury could have based his conviction on one of these acts his conspiracy conviction must be reversed.

In *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the defendants were convicted of conspiracy to violate the Smith Act, 18 U.S.C. § 2385, by advocating the overthrow of the government and by organizing persons to advocate the overthrow of the government. The Supreme Court held that the allegation that the defendants conspired to organize persons was barred by the statute of limitations. *Id.* at 312, 77 S.Ct. at 1073. The Court specifically rejected the government's argument that the conspiracy conviction could be affirmed on the basis of the advocating allegation. *Id.* at 311, 77 S.Ct. at 1073. The Court observed that the jury instructions did not clearly require the jury to find that the defendants conspired to both advocate and organize. *Id.* Moreover, the Court noted that the jury was required to find an overt act, and there was "no way of knowing whether the overt act found by the jury was one which it believed to be in furtherance of the 'advocacy' rather than the 'organizing' objective of the alleged conspiracy." *Id.* at 311–12, 77 S.Ct. at 1073. As the Court stated, "[i]n these circumstances ... the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected." *Id.* at 312, 77 S.Ct. at 1073 (citations omitted). *See also Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983) ("a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground").

■ In *Griffin v. United States,* —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the Supreme Court limited *Yates'* holding to situations in which one of the possible bases of conviction was *legally* insufficient as opposed to *factually* insufficient. *Id.* at —— —, 112 S.Ct. at 470–72. *See also United States v. Pace,* 981 F.2d 1123, 1130 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993). In *Griffin,* the jury returned a general verdict finding the defendant guilty of conspiracy to defraud the United States by impairing the efforts of the Internal Revenue Service to ascertain income taxes and impairing the efforts of the Drug Enforcement Administration to ascertain forfeitable assets. —— U.S.

at ——, 112 S.Ct. at 468. While there was sufficient evidence to prove that the defendant conspired to defraud the IRS, the government conceded that the evidence was insufficient to prove that the defendant conspired to defraud the DEA. *Id.* at ——, 112 S.Ct. at 468. The *Griffin* Court distinguished *Yates* on the grounds noted above and recognized the precedent on which *Yates* relied was limited to cases in which one of the grounds which the jury might have based the conviction was constitutionally prohibited. *Id.* at ——————, 112 S.Ct. at 470–72. *See Cramer v. United States,* 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441 (1945) (possible ground of conviction violated Article III, § 3 requirement of "two Witnesses to the same overt Act" for conviction of treason); *Williams v. North Carolina,* 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942) (possible ground of conviction violated Full Faith and Credit Clause); *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (possible ground of conviction violated First Amendment). The *Griffin* Court held that the government's failure to prove one of the unlawful objectives of the conspiracy did not require reversal of the defendant's conspiracy conviction. —— U.S. at ——————, 112 S.Ct. at 472–73. Thus, after *Griffin,* a general verdict on a conspiracy count charging disjunctive objectives must be reversed if the jury could have based its verdict on a legally or constitutionally infirm objective; however, factual insufficiency of one or more of the objectives does not require reversal as we will presume that the jury rejected the factually inadequate theory and convicted on an alternative ground for which the evidence was sufficient. *See Pace,* 981 F.2d at 1130 (affirming conviction for distributing methamphetamine or amphetamine even though there was a "total lack of evidence" that defendant distributed amphetamine). Accordingly, we must reverse Defendant's conspiracy conviction if any of the objectives were legally insufficient. *See United States v. Garcia,* 992 F.2d 409, 416 (2d Cir.1993).

We need go no further than consider the objectives relating to the diversion of the natural gas condensate as two of them—*i.e.* transporting natural gas condensate to an unpermitted facility and falsifying the mani-

fest—are legally insufficient. We recognize that we have already held that these counts were not legally insufficient in the sense that Defendant's pretrial motion to dismiss should have been granted. However, our reasoning was based on the fact that the counts properly charged all the elements of the crimes and the issue of whether natural gas condensate was a hazardous waste depended on the factual issue of how the natural gas condensate was ultimately disposed. The government proceeded to trial on an erroneous theory that the natural gas condensate was hazardous waste unless it was used in a manner normally intended by the industry or in its original intended manner. The district court instructed the jury on this erroneous theory. Because the government proceeded on an erroneous theory, the government case with respect to these counts suffered from a failure of proof. Nonetheless, because of the government's erroneous theory and the district court's erroneous instruction, these objectives were legally insufficient as well.

The *Griffin* Court recognized this very distinction. As the Court stated, "the term 'legal error' means a mistake about the law, as opposed to a mistake concerning the weight or factual import of the evidence." Here, both the government and the district court were mistaken about the law, as burning natural gas condensate as automotive fuel does not fit within the regulatory definition of hazardous waste and, therefore, Defendant's actions were not within the statutory definition of the crime. This renders two of the three RCRA objectives of the conspiracy legally insufficient. "[W]hether ... the action fails to come within the statutory definition of the crime" constitutes "legal error" and is controlled by *Yates.* *See Griffin,* —— U.S. at ——, 112 S.Ct. at 474. Because the jury was erroneously instructed on the question of whether the natural gas condensate was hazardous waste, this is not the case where we can "assume that jurors ... reject[ed] the 'factually inadequate theory.'" *Pace,* 981 F.2d at 1130 (citing *Griffin,* —— U.S. at ——, 112 S.Ct. at 474). *Cf. Walther v. Lone Star Gas Co.,* 952 F.2d 119, 126 (5th Cir.1992) (applying *Griffin* and holding that "[b]ecause the district court's instruction on

statistical proof was legally correct, although not factually supported, there was not reversible error"). Rather, this is the case in which "a particular theory of conviction ... is contrary to law." *Griffin*, —— U.S. at ——, 112 S.Ct. at 474. Therefore, Defendant's count 1 conspiracy conviction must be reversed. *See id.; Yates*, 354 U.S. at 312, 77 S.Ct. at 1073. *See also Pace*, 981 F.2d at 1130 ("[a] disjunctive charge may result in jury error when one of the alternatives is legally inadequate").

### V.

Defendant's convictions on counts 1, 2, 3 and 7 are REVERSED. Defendant's convictions on counts 4 and 8 are AFFIRMED. The case is REMANDED to the district court for proceedings consistent with this opinion.