**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**HAYES INTERNATIONAL CORPORA-**
**TION and Louis H. Beasley,**
**Defendants-Appellees.**

**No. 84–7796.**

United States Court of Appeals,
Eleventh Circuit.

April 21, 1986.

J. Carol Williams, Dept. of Justice, Appellate Section, Land and Natural Resources Div., Dirk D. Snel, Judson W. Starr, Director, Environmental Crimes Unit, Washington, D.C., for plaintiff-appellant.

David B. Byrne, Jr., Montgomery, Ala., H. Thomas Wells, Jr., Birmingham, Ala., for Hays Intern. Corp.

L. Drew Redden, Redden, Mills & Clark, Birmingham, Ala., for Beasley.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

The degree of knowledge necessary for a conviction under 42 U.S.C. § 6928(d)(1), unlawful transportation of hazardous waste, is the principal issue in this appeal. The district court granted judgments of acquittal notwithstanding the jury verdicts. The court held that the government had not presented sufficient evidence of knowledge to support convictions of Hayes International Corp. and L.H. Beasley. A decision of the district court setting aside a jury verdict of guilty is entitled to no deference, *United States v. Burns*, 597 F.2d 939, 941 (5th Cir.1979), and we have conducted our own review of the evidence and find it sufficient. Accordingly, we reverse.

## I. BACKGROUND

Hayes International Corp. (Hayes) operates an airplane refurbishing plant in Birmingham, Alabama. In the course of its business, Hayes generates certain waste products, two of which are relevant to this case. First, Hayes must drain fuel tanks of the planes on which it works. Second, Hayes paints the aircraft with spray guns and uses solvents to clean the paint guns and lines, thereby generating a mix of paint and solvents.

L.H. Beasley was the employee of Hayes responsible for disposal of hazardous wastes. In early 1981, Beasley orally agreed with Jack Hurt, an employee of Performance Advantage, Inc., to dispose of certain wastes. Under the agreement, Performance Advantage would obtain from Hayes the valuable jet fuel drained from the planes; Performance Advantage would pay twenty cents per gallon for the jet fuel, and, at no charge, would remove other wastes from the Hayes plant including the

mixture of paint and solvents. Performance Advantage was a recycler, and used the jet fuel to make marketable fuel. Wastes were transported from Hayes to Performance Advantage on eight occasions between January 1981 and March 1982.

Beginning in August 1982, government officials discovered drums of waste generated by Hayes and illegally disposed of by Performance Advantage. Approximately six hundred drums of waste were found, deposited among seven illegal disposal sites in Georgia and Alabama. The waste was the paint and solvent which Performance Advantage had removed from Hayes. Some of the drums were simply dumped in yards, while others were buried.

The prosecutions in this case were brought under the Resource Conservation and Recovery Act. · 42 U.S.C. §§ 6901–6987. The Act creates a cradle to grave regulatory scheme to ensure that hazardous wastes are properly disposed of. Generators of waste are required to identify hazardous wastes, 42 U.S.C. § 6922(1), and use a manifest system to ensure that wastes are disposed of only in facilities possessing a permit. 42 U.S.C. § 6922(5).

The regulatory scheme sets forth two different methods of identifying a hazardous waste. 40 C.F.R. § 261.3. A waste is hazardous if it appears on a list of wastes adopted by the Environmental Protection Agency. The list appears at 40 C.F.R., Subpart D. A waste is also hazardous if it possesses certain characteristics. These characteristics are set forth in 40 C.F.R., Subpart C. The mixture of paint waste and solvent involved in this case was a characteristic waste based on its ignitability.[1] 40 C.F.R. § 261.21.

Beasley and Hayes each were convicted of eight counts[2] of violating 42 U.S.C. § 6928(d)(1), which provides criminal sanctions for

> Any person who (1) knowingly transports any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under section 6925 of this title.[3]

Hayes' liability is based on the actions of Beasley. It is undisputed that Performance Advantage did not have a permit.

In their motion for judgment notwithstanding the verdict and on appeal, the appellees raise three basic theories of defense, and argue that the government's evidence was insufficient to refute any of them. First they contend that they did not commit any "knowing" violation because they misunderstood the regulations. Second, they contend that they did not "know" that Performance Advantage did not have a permit. Third, they contend that they did not commit a knowing violation because they believed that Performance Advantage was recycling the waste. Under the regulations in force at the time, characteristic hazardous waste was not regulated if it was "beneficially used or re-used [sic] or legitimately recycled or reclaimed." 40 C.F.R. § 261.6(a)(1), *superseded* effective July 5, 1985, 50 Fed.Reg. 665.

On appeal, the government argues that the first two defenses are legally insufficient, and that the jury could have rejected the third on the basis of the evidence. We cannot precisely discern from the district

---

**1.** There was some confusion below concerning whether the wastes involved in this case qualified as listed wastes as well as characteristic wastes. The government does not press this issue on appeal and we give it no consideration. For the purposes of deciding this appeal we assume the wastes were not listed wastes.

**2.** Five persons were charged in the indictment: Beasley, Lyndol Bolton, V.O. Abrams, Ray Kelly and David Smith. Kelly was a fugitive from justice at the time of trial. Bolton, the owner of Performance Advantage, plead guilty in an agreement with the government. The district court granted judgments of acquittal at the close of the government's case on behalf of Abrams and Smith.

Hayes and Beasley were also charged with counts under 42 U.S.C. § 6928(d)(2)(A), and with a conspiracy count under 18 U.S.C. § 371. The district court entered judgments of acquittal on the 42 U.S.C. § 6928(d)(2)(A) counts at the close of the government's case. The jury acquitted Hayes and Beasley on the conspiracy charge.

**3.** The current version of the statute applies to anyone who "transports or causes to be transported." 42 U.S.C.A. § 6928(d)(1) (Supp.1985).

court's order whether it accepted all three of these defenses. Moreover, in the course of considering the sufficiency of the evidence, the district court held that several of the inferences advanced by the government were impermissible. Accordingly, to properly evaluate the appellees' contentions we must first consider the nature of the criminal offense involved.

## II. THE ELEMENTS OF A SECTION 6928(d) OFFENSE

Congress did not provide any guidance, either in the statute or the legislative history, concerning the meaning of "knowing" in section 6928(d).[4] Indeed, Congress stated that it had "not sought to define 'knowing' for offenses under subsection (d); that process has been left to the courts under general principles." S.Rep. No. 172, 96th Cong., 2d Sess. 39 (1980), U.S.Code Cong. & Admin.News 1980, pp. 5019, 5038. In discerning the relevant general principles, we turn to a few examples from a long line of Supreme Court cases discussing the necessary elements of regulatory offenses.

*Whether Knowledge of the Regulations is Required*

In certain cases, the Court has held that an offense requires no mental element, but simply requisite actions. In *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the defendant was charged with violating a statute making it unlawful "to receive or possess a firearm which is not registered to him." 401 U.S. at 607. The Court held that no element of scienter was necessary for conviction; a person need not even have known that the grenades were unregistered. The Court reasoned that the statute itself set forth no mental element, and that the statute was

> a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act.

401 U.S. at 609, 91 S.Ct. at 1118. *See also United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

The Court has had greater difficulty with statutes in which Congress has created an offense of "knowingly violating a regulation." In *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), the defendant was charged with "knowingly" violating an I.C.C. regulation. The regulation prohibited shipping hazardous materials without showing them on the shipping papers. The Court held that knowledge of the regulation was not an element of the offense; the use of "knowingly" in the statute referred only to the defendant's knowledge that the materials being shipped were dangerous. The Court noted the general maxim that ignorance of the law is no excuse, but also reasoned that where

> obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation.

402 U.S. at 565, 91 S.Ct. at 1701. The Court interpreted a similar statute in *Boyce Motor Lines v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952): the statute also punished "knowing" violations of I.C.C. regulations. The regulation at issue required shippers of dangerous materials to select the least crowded route. The Court stated that a conviction would require that the shipper knew of a safer route or willfully neglected to consider a safer route. 342 U.S. at 342, 72 S.Ct. at 331.

The Court reached a different result in a recent case involving food stamps, *Liparota v. United States*, —— U.S. ——, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). The statute in *Liparota* provided punishment for anyone who "knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not

---

**4.** Congress also created the offense of knowing endangerment, for which it did set forth some standards. 42 U.S.C. § 6928(e).

authorized by [the statute] or the regulations." 105 S.Ct. at 2085. The government argued that "knowingly" simply referred to knowledge of acquiring or possessing food stamps, and that the defendant need not have known the acquisition was in violation of the regulations. The Court disagreed, holding that knowledge of illegality was necessary. The Court reasoned that to hold "otherwise would be to criminalize a broad range of apparently innocent conduct." 105 S.Ct. at 2088. The Court also noted that the statute was distinguishable from those in *Freed* and *International Minerals*, because it did not involve "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health and safety." 105 S.Ct. at 2092.

The appellees contend that our interpretation of section 6928(d)(1) should be controlled by *Liparota*. They argue that a violation of section 6928(d)(1) therefore requires knowledge of transportation, knowledge that the waste is a waste within the meaning of the statute, knowledge that disposal sites must have a permit, and knowledge that the site in question does not have a permit. In short, they contend that the defendants must have known that their actions violated the statute. The appellees find some support for their position in the recent decision of *United States v. Johnson & Towers*, 741 F.2d 662 (3d Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985).

■ We conclude that *Liparota* does not control this case. First, section 6928(d)(1) is not drafted in a manner which makes knowledge of illegality an element of the offense. The statute in *Liparota*, paraphrased, prohibited "knowing violation of a

regulation," and reading a legal element into the offense therefore made linguistic sense. In addition, section 6928(d)(1) is undeniably a public welfare statute, involving a heavily regulated area with great ramifications for the public health and safety. As the Supreme Court has explained, it is completely fair and reasonable to charge those who choose to operate in such areas with knowledge of the regulatory provisions. Indeed, the reasonableness is borne out in this case, for the evidence at trial belied the appellees' profession of ignorance. Accordingly, in a prosecution under 42 U.S.C. § 6928(d)(1) it would be no defense to claim no knowledge that the paint waste was a hazardous waste within the meaning of the regulations; nor would it be a defense to argue ignorance of the permit requirement.

### Whether Knowledge of the Permit Status is Required

■ The government argues that the statute does not require knowledge of the permit status of the facility to which the wastes are transported. The Supreme Court has noted that statutes similarly drafted in the manner of section 6928(d) are linguistically ambiguous: it is impossible to tell how far down the sentence "knowingly" travels. *Liparota*, 105 S.Ct. at 2087–88 & n. 7.[5] In *Liparota*, as we discussed above, the Court held that "knowingly" travelled all the way down the sentence. In another recent case, however, the Court held that "knowingly" did not modify all elements of the crime at issue. *United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984) (statute forbidding knowingly making a false statement within the jurisdiction of a federal

---

5. The Court noted the following hypothetical: Still further difficulty arises from the ambiguity which frequently exists concerning what the words or phrases in question modify. What, for instance, does 'knowingly' modify in a sentence from a 'blue sky' law criminal statute punishing one who 'knowingly sells a security without a permit' from the securities commissioner? To be guilty must the seller of a security without a permit know only that what he is doing constitutes a sale, or must he also know that the thing he sells is a security, or must he also know that he has no permit to sell the security he sells? As a matter of grammar the statute is ambiguous; it is not at all clear how far down the sentence the word 'knowingly' is intended to travel—whether it modifies 'sells,' or 'sells a security,' or 'sells a security without a permit.' 104 S.Ct. at 2088 n. 7 (quoting W. LaFave & A. Scott *Criminal Law* § 27 (1972)).

agency does not require actual knowledge of federal jurisdiction).

In this case, the congressional purpose indicates knowledge of the permit status is required. The precise wrong Congress intended to combat through section 6928(d) was transportation to an unlicensed facility. Removing the knowing requirement from this element would criminalize innocent conduct; for example, if the defendant reasonably believed that the site had a permit, but in fact had been misled by the people at the site.[6] *Liparota*, 105 S.Ct. at 2088. If Congress intended such a strict statute, it could have dropped the "knowingly" requirement. *See, e.g., United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). We also note that the statute is different than that in *Yermian*, where making a false statement would not be an innocent act regardless of whether the declarant knew the statement was to be submitted to a federal agency.

The government does not face an unacceptable burden of proof in proving that the defendant acted with knowledge of the permit status. Knowledge does not require certainty; a defendant acts knowingly if he is aware " 'that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.' " *United States v. United States Gypsum Co.*, 438 U.S. 422, 445, 98 S.Ct. 2864, 2877, 57 L.Ed.2d 854 (1978) (quoting W. LaFave & A. Scott, *Criminal Law* 196 (1972)); *United States v. Bailey*, 444 U.S. 394, 404, 100 S.Ct. 624, 631, 62 L.Ed.2d 575 (1980). Moreover, in this regulatory context a defendant acts knowingly if he willfully fails to determine the permit status of the facility. *Boyce*, 342 U.S. at 337, 72 S.Ct. at 329.

Moreover, the government may prove guilty knowledge with circumstantial evidence. *See, e.g., United States v. Cruz-Valdez*, 773 F.2d 1541 (11th Cir.1985) (en banc) (presence on vessel with large amount of contraband during long voyage allows inference of knowledge); *United States v. Burns*, 597 F.2d 939, 942–45 (5th Cir.1979) (approving common law inference that a person possessing stolen property knows it is stolen).[7] In the context of the hazardous waste statutes, proving knowledge should not be difficult. The statute at issue here sets forth certain procedures transporters must follow to ensure that wastes are sent only to permit facilities. Transporters of waste presumedly are aware of these procedures, and if a transporter does not follow the procedures, a juror may draw certain inferences. Where there is no evidence that those who took the waste asserted that they were properly licensed, the jurors may draw additional inferences. Jurors may also consider the circumstances and terms of the transaction. It is common knowledge that properly disposing of wastes is an expensive task, and if someone is willing to take away wastes at an unusual price or under unusual circumstances, then a juror can infer that the transporter knows the wastes are not being taken to a permit facility.[8]

---

6. It may seem anomalous to hold that the government need not show that the defendant had actual knowledge that the law requires a permit, but that it must show knowledge of the permit status of the disposal site at issue. As Justice White stated, however, in discussing the hypothetical set forth in footnote 5, *supra,* a seller need not know a license is required to sell a security as long as the seller knows he does not have a permit. 105 S.Ct. at 2094 (White, J., dissenting). Here, if the transporter does not know a permit is required, but knows the facility does not have one, or knows he has not inquired, then sufficient knowledge is shown.

7. In setting aside the jury verdicts, the district court rejected certain inferences from the evi-

dence as analogous to conclusive presumptions, and therefore violative of due process. The district court's approach was misguided; "an inference is a conclusion which the law *permits* the jury to draw if it finds a given set of facts; a presumption, on the other hand, is a conclusion which the law directs the jury to draw from the facts." *United States v. Burns*, 597 F.2d 939, 943 n. 7 (5th Cir.1979) (emphasis in original).

8. The government argues that proof of shipment of hazardous waste to a facility without a permit, if unexplained, *always* raises an inference sufficient to go to the jury. In this case other inferences were also present, and we need not address what is the absolute minimum evidence necessary to reach the jury.

In sum, to convict under section 6928(d)(1), the jurors must find that the defendant knew what the waste was (here, a mixture of paint and solvent), and that the defendant knew the disposal site had no permit. Knowledge does not require certainty, and the jurors may draw inferences from all of the circumstances, including the existence of the regulatory scheme.

## III. ANALYSIS

### A.

■ We now turn to the three defenses appellees rely upon. The first is simply a mistake of law defense. They contend that they held a good faith belief that any waste sent to a recycler was exempt from the regulations, regardless of whether the waste was actually recycled. The discussion set forth above indicates that ignorance of the regulatory status is no excuse.[9] There is no dispute that the appellees knew that the waste was a combination of paint and solvents; nor is there any dispute that the mixture was a hazardous waste. Accordingly, the evidence was sufficient for the jury to find the appellees knowingly transported hazardous waste.

### B.

The appellees' second defense is that the evidence was insufficient to show they knew that Performance Advantage did not have a permit. In considering the evidence, we view it in the light most favorable to the government, with all reasonable inferences drawn in favor of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Cruz-Valdez,* 773

F.2d 1541, 1544 (11th Cir.1985) (en banc). The evidence shows that Hayes was not following the regulatory procedure for manifesting waste sent to a permit site, from which the jury could have inferred that the appellees did not believe Performance Advantage had a permit. This inference is strengthened by Hayes' own documents, which set forth this requirement. Performance Advantage also was not charging to haul away the waste (although obviously they found the overall deal advantageous), and Beasley thought he had made a good deal; accordingly the terms were such as to raise suspicion.

The appellees rely on Hurt's testimony that he had had an EPA "number," and that he could not recall whether he had given it to Beasley. Drawing all reasonable inferences in favor of the government, the jury could have found that Hurt did not give the EPA "number" to Beasley. In addition, the "number" was not a permit, and the jury could have inferred that Beasley did not believe the number evidenced an actual permit.[10] Accordingly, the jury could have found that there was no evidence that Performance Advantage professed to be a permit facility. Based on all the above, the jury could have found beyond a reasonable doubt that appellees knew Performance Advantage did not have a permit.

### C.

■ Appellees' third defense is that they believed that Performance Advantage was recycling the waste. At the outset, we accept the theory of this mistake of fact defense. As the Supreme Court stated in

---

**9.** Even if we were to accept this mistake of law defense, it is not clear that reversal would have been required. Indeed, the district court's instructions to the jury can be read as allowing the defense. The evidence would have allowed the jury to find knowledge that the wastes were hazardous within the meaning of the regulations.

Appellees rely on the testimony of Hayes official Charles Reymann. He testified, however, that he told Beasley "that as long as it was being reused and recycled it did not ... it was not classified as a hazardous waste." At one point Reymann stated that he had viewed the exception as applying when waste was "sent" for recycling. At no point, however, did he testify that he told Beasley that any waste sent to a recycler was not hazardous waste. In addition, documents from Hayes confirm that Hayes and Beasley accurately understood the regulations. Finally, the interpretation offered by appellees simply makes little sense; why would the regulations except waste that was being sent to a recycler if they were not actually being recycled? For all these reasons the jury could easily have drawn the necessary inferences to reject the mistake of law defense.

**10.** Indeed no permit actually existed.

*United States v. International Minerals,* 402 U.S. 558, 563–64, 91 S.Ct. 1697, 1700–01, 29 L.Ed.2d 178 (1971), a case involving "knowing" shipment of dangerous chemicals, a person who believed "in good faith that he was shipping distilled water when in fact he was shipping some dangerous acid would not be covered." In this case, had the wastes been recycled, then no violation of the statute would have occurred. Accordingly, a good faith belief that the materials were being recycled is analogous to the good faith belief in *International Minerals* that the acid was actually water.

We believe, however, that there is sufficient evidence for the jury to have rejected the defense of mistake of fact. First, we note that the exemption only applies if the waste was actually recycled. 40 C.F.R. § 261.6(a)(1), *superseded* effective July 5, 1985, 50 Fed.Reg. 665. Accordingly, the defense requires a good faith belief that the waste was actually being recycled. Moreover, the government was not required to disprove the appellees' mistake of fact defense. The government need not disprove every reasonable hypothesis of innocence; rather the government must simply prove guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *United States v. Cruz-Valdez,* 773 F.2d 1541, 1544–45 (11th Cir.1985) (en banc). In this case, three areas of the evidence could have led the jury to reject the mistake of fact defense.

First, are the negotiations that led to the arrangement. Jack Hurt, who negotiated the deal for Performance Advantage testified at trial. He contacted Beasley in late 1980 or early 1981 about purchasing jet fuel from Hayes. After Hurt asked "what it would take" to obtain the right to purchase the jet fuel, the parties agreed that Performance Advantage would take away a load of the paint wastes, at no charge, and attempt to run them through their system to make fuel. The proposed deal was that Performance Advantage would obtain the jet fuel for twenty cents per gallon if it would also haul away the paint

waste. Thirty drums of the paint waste were then shipped to the Performance Advantage plant. Hurt was not responsible for the test run at the plant, but his supervisor, Lyn Bolton, instructed him to find out if Performance Advantage could obtain the jet fuel without the paint waste. Hurt then told Beasley that Bolton did not want the paint waste, but Beasley replied that "he liked the deal the way it was; to take it all." Bolton then decided to take the paint waste as well as the jet fuel.

The inferences that the jury could have drawn from the above testimony are clear. Beasley knew that Performance Advantage had tested the paint sludge in its recycling system, and that after this test Performance Advantage did not want the paint sludge, even for free. If Performance Advantage found it desirable to run the waste through its system, it would not have objected to a deal in which it obtained the waste at no cost. Accordingly, the jury could infer from this exchange that Beasley knew that Performance Advantage did not intend to recycle the paint waste.

The second type of evidence showing appellees' knowledge consisted of internal documents from Hayes. For example, one document, a compliance memorandum from Hayes official Charles Reymann to Beasley, stated:

> Hazardous waste with no resale value, which must be disposed of, shall be hauled to an EPA-approved disposal site. The hauler and the disposal site must both have an EPA interim permit number. A manifest must be used to identify the materials hauled, the hauler, and the disposal site. A copy of the manifest must be returned to Hayes by the disposal site operator.

Government Exhibit 30. The evidence showed that Performance Advantage did not want the paint waste, even at no charge, and Beasley therefore knew it had no resale value. The memorandum directed that wastes with no resale value be sent to EPA approved sites, and that manifests must be used to confirm disposition of the wastes. The jury could infer from Beas-

ley's violation of company procedures that he knew the disposition of the waste was improper. The documentary evidence also showed that proper disposition of the waste was Beasley's responsibility; the jury could infer from the fact that it was Beasley's business to know what happened to the waste, that indeed he did know.

Third, subsequent conversations between Hurt and Beasley removed any doubt whether Beasley thought the wastes were being recycled. Six months after the first shipment, around August 1, 1981, Beasley and Hurt discussed the agreement, and Beasley stated that "It was a good business deal for them; that they liked it; that he had saved the company some money." Hurt related an even more damaging conversation:

Q: Now, during the time that you were handling this waste and taking it from Hayes to Performance Advantage did Mr. Beasley ask what was being done with the waste?

A: Yes, sir.

Q: Did he ask on one occasion or more than one occasion?

A: Probably more than one.

Q: What did you tell him?

A: I told him that it went to the plant, what they did with it down there wasn't my worry, that it could be in that lake or pond or buried anywhere out there on a thousand acres that might be there. Performance Advantage, one of the stockholders owned approximately a thousand acres, and it could be down there anywhere. I didn't know.

These conversations show knowledge on the part of Beasley. Beasley's belief that having Performance Advantage take the waste at no charge was a good deal shows that he knew that it would cost Hayes money to have the waste properly disposed of, and that he knew the waste was not valuable for purposes of recycling. In the second conversation, Hurt mentioned numerous possible dispositions of the waste, notably excluding recycling. The jury could infer from these conversations that Beasley did not believe the waste was being recycled.

The appellees argue that any inferences the jury could draw from this conversation would relate only to the counts for shipments which occurred after the conversation. We disagree. Beasley was directly told that the waste was being disposed of rather than recycled, and he nevertheless continued to ship waste to Performance Advantage; this indicates that the agreement was never premised on recycling of the waste. Accordingly, we conclude that the inferences would support conviction for shipments both before and after the conversation.

The judgments of acquittal notwithstanding the verdict as to both defendants are vacated. The case is remanded to the district court to enter judgment in accordance with the jury verdicts of guilty.

REVERSED and REMANDED.