# United States Court of Appeals
## For the First Circuit

---

No. 01-1231

UNITED STATES,

Appellee,

v.

RICHARD C. LEWKO,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Stahl, Senior Circuit Judge.

---

Bjorn Lange, Assistant Federal Public Defender, for appellant.
Peter E. Papps, Assistant United States Attorney, with whom Gretchen Leah Witt, United States Attorney, and Jean B. Weld, Assistant United States Attorney, were on brief, for appellee.

---

October 25, 2001

---

**STAHL, Senior Circuit Judge**.  Defendant Richard Lewko challenges his convictions under the Child Support Recovery Act of 1992 (CSRA), 18 U.S.C. § 228(a)(1), and the Deadbeat Parents Punishment Act of 1998 (DPPA), 18 U.S.C. § 228(a)(3).  In this appeal, Lewko argues that, in light of <u>United States</u> v. <u>Morrison</u>, 529 U.S. 598 (2000), this Court should reconsider its ruling in <u>United States</u> v. <u>Bongiorno</u>, 106 F.3d 1027 (1st Cir. 1997), <u>reh'g en banc denied</u>, 110 F.3d 132 (1st Cir. 1997), which rejected a Commerce Clause challenge to the CSRA, and likewise should strike down the DPPA as unconstitutional.  For the following reasons, we find the defendant's arguments to be without merit and affirm his convictions.

## I.

In 1982, Richard Lewko married Roxanne Medina during a mass marriage ceremony conducted at Madison Square Garden in New York City by the Rev. Sun Myung Moon.  Four years later, the couple moved to Derry, New Hampshire.  In 1997, Medina initiated divorce proceedings against Lewko in Rockingham Superior Court, and was awarded custody of their three minor children.  Lewko was ordered to pay all household expenses, and child support of $397 per month divided into weekly payments.  On June 23, 1997, the child support order was amended to $65 per week, and an

additional $30 per week to pay a then-outstanding arrearage of $794.

Subsequently, Lewko filed an affidavit with the marital master in the divorce case, stating that he had moved to Boston, that he had voluntarily quit his job, and that he could only afford to pay $75 per week in child support.[1]  He also claimed that, unless the court granted him custody of the children, he would not make any child support payments.  Following a hearing on August 12, 1997, the marital master found Lewko in contempt for failure to make mortgage and child support payments.  Although the August 1997 finding was purged after Lewko made a lump-sum payment, by October 1997, Lewko had fallen into arrears of $19,659.  Also, as a result of Lewko's failure to make his court-ordered payments, the bank commenced foreclosure proceedings on the family homestead where Medina lived with the children.  Because of his continued flaunting of the court order, Lewko was incarcerated twelve days for contempt and ordered to pay $2,100 in arrearage.  This payment was made by church members on his behalf.  In March 1998, Lewko was ordered to appear for another contempt hearing for his ongoing failure to make support payments, but Medina requested that the contempt

_____

[1]     Prior to Medina's filing for divorce, the defendant had worked continuously at an income in excess of $100,000 per year.

-4-

motion be dismissed after Lewko assured her that he would get a job and start to "help out." However, as with previous assurances, Lewko reneged on this promise.

After the divorce was finalized on July 30, 1998, Medina turned to the New Hampshire Division of Child Support Services for assistance in forcing Lewko to make his court-ordered payments. Because Lewko was no longer residing in New Hampshire, neither the arrest warrant nor the contempt capias issued by the New Hampshire courts was to any avail. Ultimately, the case was turned over to the U.S. Department of Health and Human Services. A federal arrest warrant was issued on March 8, 2000, and was executed on Lewko in Landover Hills, Maryland, on March 23, 2000.

Defendant was indicted on three counts: (1) willfully and unlawfully failing to pay a support obligation of a state court that has been outstanding for over two years and is greater than $10,000, 18 U.S.C. § 228(a)(3); (2) moving and traveling in interstate and foreign commerce with the intent to evade a state court-ordered support obligation, 18 U.S.C. § 228(a)(2); and (3) willfully and unlawfully failing to pay a support obligation of a state court that has been outstanding for over a year and is greater than $5,000, 18 U.S.C. § 228(a)(1). Lewko filed a pre-trial motion to dismiss Counts 1

and 3 as unconstitutional exercises of Congress' Commerce Clause[2] authority. The district court denied the motion, but, upon the conclusion of the government's case, dismissed Count 2 of the indictment, finding that there was no evidence to support the allegation that Lewko had crossed state lines for the purpose of evading his support obligations.[3] Lewko was convicted by a jury on Counts 1 and 3, and received concurrent sentences of five years probation with twelve months home incarceration, and was ordered to pay $56,762.23 in arrearage as restitution.[4]

## II.

In his appeal, Lewko argues that this Court should revisit United States v. Bongiorno, 106 F.3d 1027 (1st Cir. 1997) (upholding CSRA against Commerce Clause challenge), reh'g en banc denied, 110 F.3d 132 (1st Cir. 1997), and strike down the CSRA and the DPPA in light of the Supreme Court's most recent elucidation of Commerce Clause jurisprudence in United States v. Morrison, 529 U.S. 598 (2000), which invalidated a

---

[2]     U.S. Const., art. I, § 8, cl. 3.

[3]     Consequently, defendant does not challenge the constitutionality of 18 U.S.C. § 228(a)(2) in this appeal.

[4]     The CSRA made the failure to pay a court-ordered child support obligation a Class B misdemeanor offense, punishable by up to six months imprisonment. The DPPA increased the offense level to a Class E felony, with a maximum possible term of two years imprisonment.

-6-

federal statute providing a civil remedy to female victims of gender-motivated violence as insufficiently related to interstate commerce to justify Congressional regulation. Specifically, Lewko asserts that Congress has violated fundamental principles of federalism by encroaching on an area reserved to the states -- namely, family law and domestic relations -- through the enactment of these child support collection provisions. Accordingly, he asks this Court, first, to overrule the prior panel's decision affirming the constitutionality of the CSRA, and, second, to invalidate the DPPA.

According to the "law of the circuit" doctrine, a prior panel decision shall not be disturbed "absent either the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course." United States v. Chhien, No. 00-2230, 2001 WL 1097766, at *8 (1st Cir. Sept. 24, 2001). Lewko maintains that the Supreme Court's decision in Morrison, limiting the ability of Congress to regulate non-economic activity that may affect interstate commerce, was one such intervening event.

-7-

Lewko argues that the Sixth Circuit's decision in United States v. Faasse, 227 F.3d 660 (6th Cir. 2000), reh'g en banc granted, opinion vacated by 234 F.3d 312 (6th Cir. 2000), offered "non-controlling but persuasive case law" that would justify revisiting Bongiorno. In Faasse, Judge Batchelder, writing for a unanimous panel, ruled that the CSRA fell outside the scope of Congress' Commerce Clause authority because these provisions, which allow prosecutions in cases where the deadbeat parent resides in a different state from the child, lacked a sufficient nexus with interstate commerce to sustain jurisdiction. Lewko maintains that the Bongiorno panel would have reached a different conclusion had it had the benefit of the Supreme Court's decision in Morrison and Judge Batchelder's analysis in Faasse. See United States v. Royal, 174 F.3d 1, 10 (1st Cir. 1999) (noting that "authority that postdates the original decision, although not directly controlling, [may] nevertheless offer[] a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind") (quoting Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)).

Prior to the oral argument in this case, the Sixth Circuit, sitting *en banc*, reversed the decision of the Faasse panel, and sustained the CSRA against any challenge raised

pursuant to the Commerce Clause. United States v. Faasse, No. 98-2337, 2001 WL 1058237 (6th Cir. Sept. 14, 2001) (en banc). Notwithstanding the *en banc* reversal, Lewko still maintains that the Morrison opinion standing alone offers a sufficient basis for this Court to revisit the decision of the Bongiorno panel. We are not convinced.

### III.

We review the decisions of district courts regarding challenges to a statute's constitutionality *de novo*. See United States v. Marenghi, 109 F.3d 28, 31 (1st Cir. 1997). The Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power": (1) Congress may regulate the use of the "channels of interstate commerce;" (2) Congress may regulate "instrumentalities of interstate commerce or things in interstate commerce," even if the threat may come only from intrastate activities; (3) Congress may regulate "those activities having a substantial relation to interstate commerce. . . ." Morrison, 529 U.S. at 608-09 (quoting United States v. Lopez, 514 U.S. 549, 558-59 (1995)). When Congress legislates pursuant to a valid exercise of its Commerce Clause authority, we scrutinize the enactment according to rational basis review. See Hodel v. Virginia

<u>Surface Mining & Reclamation Ass'n, Inc.</u>, 452 U.S. 264, 276 (1981).

The <u>Morrison</u> court deployed the three-prong test from <u>Lopez</u> to determine whether Congress had exceeded its power under the Commerce Clause when enacting the Violence Against Women Act (VAWA), 42 U.S.C. § 13981.  As important as <u>Morrison</u> is to our understanding of Commerce Clause jurisprudence, it is equally important to recognize from the outset what <u>Morrison</u> did *not* purport to address.  Early in its opinion, the Supreme Court acknowledged that neither prong one nor prong two of the <u>Lopez</u> Commerce Clause test was implicated by the statute challenged in <u>Morrison</u>.  Rather, the Court focused on whether VAWA could satisfy the third prong of the <u>Lopez</u> inquiry, otherwise known as the "substantial effects" test.[5]  This fact alone satisfies us that <u>Morrison</u> provides no basis for overruling <u>Bongiorno</u>, where we affirmed the validity of the CSRA as a constitutional exercise of Congress' Commerce Clause authority according to the second prong of <u>Lopez</u>, finding that the statute was a

_____

[5]    See <u>Morrison</u>, 529 U.S. at 609 ("Petitioners do not contend that these cases fall within either of the first two of these categories of Commerce Clause regulation. They seek to sustain § 13981 as a regulation of activity that substantially affects interstate commerce. Given § 13981's focus on gender-motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce), we agree that this is the proper inquiry.").

permissible regulation of a "thing" in commerce. <u>Bongiorno</u>, 106 F.3d at 1033.

Nevertheless, we believe that it would be useful to examine the defendant's arguments regarding the constitutionality of the CSRA and the DPPA on the merits, rather than simply to rely on principles of stare decisis, or "law of the circuit." As we explain *infra*, these statutory provisions are undoubtedly constitutional exercises of Congress' Commerce Clause authority under two of the prongs of <u>Lopez</u>.

The CSRA and the DPPA easily satisfy the second prong of <u>Lopez</u>. In order for either of these statutory provisions to be triggered, the non-paying parent must reside in a different state than the child owed support, meaning that the payment will necessarily need to cross state lines in order to reach the intended recipient. With that in mind, we have no difficulty finding that "[a]n interstate court-ordered child support payment is clearly a 'thing' in interstate commerce." <u>Faasse</u>, 2001 WL 1058237, at *9; <u>see also</u> <u>United States</u> v. <u>Johnson</u>, 114 F.3d 476, 480 (4th Cir. 1997); <u>United States</u> v. <u>Bailey</u>, 115 F.3d 1222, 1229 (5th Cir. 1997); <u>United States</u> v. <u>Crawford</u>, 115 F.3d 1397, 1400 (8th Cir. 1997); <u>United States</u> v. <u>Sage</u>, 92 F.3d 101, 107 (2d Cir. 1996); <u>United States</u> v. <u>Mussari</u>, 95 F.3d 787, 790 (9th Cir. 1996).

At oral argument, Lewko acknowledged not only that a child support payment is a "thing," but also that this thing must cross state lines in order to satisfy the court order. Despite these concessions, however, he still maintains that a child support payment is not a "thing in interstate commerce," relying primarily on Judge Smith's dissent in Bailey. See 115 F.3d at 1236-37 (Smith, J., dissenting). First, he argues that a child support payment is a wholly different type of "thing" because it emanates from family law. Specifically, defendant asserts that a child support order is unique because it is a unilateral, rather than a reciprocal, obligation. This characterization, however, is not entirely accurate. Although the non-custodial parent has a duty to provide financial support, the custodial parent must also demonstrate that he or she is using that money for the care and upbringing of the child. Regardless, a child support obligation arising from a court order, whether family court or another civil court, is a debt that may be enforced through civil remedies. See Mussari, 95 F.3d at 790 ("True, the court order arises from the family relation. Once in place, the order creates a debt. Like any other debt, it is a thing of value, one of millions of obligations that make up the stream of commerce subject to congressional control."); see also Bongiorno, 106 F.3d at 1032

(holding that state-court-imposed child support orders are "functionally equivalent to interstate contracts" and rejecting idea that child support payment obligations are somehow "different") (citing Sage, 92 F.3d at 106). Therefore, defendant's attempt to carve out child support payments from other types of interstate monetary transfers in satisfaction of a financial obligation fails.

Second, defendant insists that this Court should limit the application of Bongiorno to cases where a party has engaged in some affirmative activity, such as absconding across state lines to avoid their support obligation, as covered by § 228(a)(2). Lewko characterizes his crime, on the other hand, as one of omission, in that he refused to put a payment in interstate commerce. However, the Supreme Court has refused to draw a categorical distinction between crimes of omission and commission. See, e.g., Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257-58 (1964); United States v. Green, 350 U.S. 415, 420 (1956); United States v. Darby, 312 U.S. 100, 115 (1941); Standard Oil Co. v. United States, 221 U.S. 1, 68 (1911). Defendant attempts to distinguish these cases by noting that Congress has historically engaged in regulation of labor relations (Darby) and the practices of common carriers such as hotels (Heart of Atlanta). Likewise, defendant argues, the

-13-

Hobbs Act, 18 U.S.C. § 1951, (Green) and the Sherman Antitrust Act, 15 U.S.C. § 1, 2, (Standard Oil) explicitly target conduct falling within the conventional understanding of "commerce." The DPPA and the CSRA, on the other hand, encroach on the traditionally local concerns of family law and domestic relations, and therefore should not be viewed with the same deference.

This argument also misses the mark. Neither the CSRA nor the DPPA have either the purpose or effect of establishing a national, uniform "family law." They address neither the degree (i.e., amount) nor duty of support owed (i.e., when a duty of support shall be triggered or terminated). Rather, the provisions of these two acts are designed to protect the integrity of state court judgments, in light of the fact that parties attempting to enforce these court orders face significant difficulties when the non-paying party flees the ordering jurisdiction. See Bailey, 115 F.3d at 1230 ("Congress did not impose the underlying obligation to pay child support. The CSRA applies only when the defendant has violated a state court order imposing upon him that obligation."); see also Faasse, 2001 WL 1058237, at *8 (rejecting claim that CSRA attempts to create "federal family law"). The defendant's

-14-

invocation of the uniquely local concerns of family law are inapposite and do not bear the weight of his argument.

A slightly more refined version of defendant's argument would posit that a child support payment is a thing, but it is not significant enough to implicate interstate commerce, because it is merely ancillary to a family court judgment. As a preliminary matter, we note that there is no "materiality" requirement embedded in Lopez's prong two analysis. Even if there were, however, the statutes on their face incorporate a "materiality" requirement by establishing threshold amounts of $5,000 (CSRA) and $10,000 (DPPA) before federal enforcement mechanisms become available. As we have already explained above, the fact that the obligation stems from a judgment arising out of a domestic dispute is insignificant. Therefore, prong two is clearly satisfied.

Under prong one of Lopez, Congress may also regulate the use of the "channels of interstate commerce." Just as we have previously determined that the payment is a "thing in interstate commerce," we similarly have no trouble finding that the payment must travel through "channels of interstate commerce" to reach the deserving party, and therefore falls within the purview of Congress' Commerce Clause authority. See Bailey, 115 F.3d at 1227. Whether transmitted via wire transfer

or through the mails, these payments necessarily change hands as a result of travel through interstate commercial channels.  <u>See also</u> <u>Mussari</u>, 95 F.3d at 790.[6]  Accordingly, we find that Congress acted well within its Commerce Clause authority when it enacted the CSRA and the DPPA, and that these provisions are rationally related to a legitimate federal objective, the payment of court-ordered child support obligations.

**IV.**

For the foregoing reasons, the defendant's convictions under both the DPPA and the CSRA are hereby affirmed.

**<u>Affirmed.</u>**

---

[6]    We need not decide whether in light of <u>Morrison</u> the CSRA and the DPPA satisfy prong three of the <u>Lopez</u> inquiry.