[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13784

_____

D.C. Docket No. 04-00039-PO-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES PERRY FIELDS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(September 21, 2007)**

Before CARNES, WILSON and HILL, Circuit Judges.

HILL, Circuit Judge:

James Perry Fields was convicted of willfully failing to pay a past due support obligation to his child who resided in another state, in violation of 18 U.S.C. § 228(a)(1) (2000). Fields appeals his conviction. For the following reasons, we shall reverse the conviction.

## I.

James Perry Fields and Claire Holland, both attorneys, married in 1979. The couple resided in Glynn County, Georgia. In 1984, Holland gave birth to a son. In 1987, the couple divorced. The Georgia divorce decree ordered Fields to pay Holland $600.00 per month in child support until the boy's eighteenth birthday. The decree also required each parent to keep the other fully informed of the child's health and whereabouts while having possession of him, during custody or visitation.

In 1988, Holland moved to Atlanta, taking the child. Fields alleges that she failed to keep him informed of their whereabouts, and in 1994, the Superior Court of Glynn County entered a contempt order against Holland for her failure to meet her obligations under the divorce decree. Fields quit paying his child support obligation around this time.

2

Sometime after 1994, Holland took the boy and left Georgia, moving from Atlanta to Orlando, Florida. Subsequently, they moved to Alabama, Washington, D.C., and then back to Orlando. During this time, the only way Fields was able to contact Holland was to send mail to her Atlanta address listing in the Georgia Bar directory. The mail was forwarded to her then-current address.[1]

In 2004, the government charged Fields with violating the Child Support Recovery Act (the "CSRA"), which criminalizes the "willful failure to pay a past due child support obligation with respect to a child who resides in another State." 18 U.S.C.A. § 228(a)(1). Upon conviction by the magistrate judge, Fields appealed to the district court, arguing that, because the CSRA punishes only the "willful" failure to pay support to an out-of-state child, he could not be convicted of violating the statute without proof he knew his son resided in another state.[2]

The district court assumed, for purposes of the appeal, that Fields did not have such knowledge, but affirmed his conviction nonetheless. The court held that the statute's requirement that the child reside in another state is merely jurisdictional, mandating proof only that the child resided in another state, not that

---

[1] The magistrate judge found that Holland was "taking measures to hide her whereabouts."

[2] Fields consented to be tried by a magistrate judge without a jury. The magistrate held that the government need not prove Fields knew his son resided in another state. Fields appealed to the district court, as required by 18 U.S.C. § 3402.

3

the defendant knew this fact, citing *United States v. Feola*, 420 U.S. 671(1975); *United States v. Monts*, 311 F.3d 993 (10th Cir. 2002) and *United States v. Lewko*, 269 F.3d 64 (1st Cir. 2001).   We review this conclusion of law *de novo*.  *United States v. Brehm*, 442 F.3d 1291, 1299 (11th Cir. 2006).

## II.

Courts of appeals have held that the elements of the CSRA are (1) a willful (2) failure to pay (3) a past due support obligation (4) to a child who resides in another state.  *United States v. Namey*, 364 F.3d 843, 847 (6th Cir. 2004); *United States v. Russell*, 186 F.3d 883 (8th Cir. 1999); *United States v. Johnson*, 114 F.3d 476, 482 (4th Cir. 1997).  We have held that the "willfulness" element of the CSRA requires the government to prove that the "law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."  *United States v. Williams*, 121 F.3d 615, 621 (11th Cir. 1997); *United States v. Brand*, 163 F.3d 1268, 1275 (11th Cir. 1998).

Fields argues that the statute's "willfulness" requirement applies to both the "failure to pay" and to the "child who resides in another State" elements.  Thus, he contends that the government was required to prove both that he knew he had a legal duty to pay a past due support obligation, *and* that he knew that the duty to pay was to a child who *resides in another state*.  The government argues that no

4

mental state is required with respect to the latter element because it is "merely jurisdictional," requiring an interstate nexus only to permit Congress to criminalize the failure to pay child support.

The district court adopted the government's interpretation of the statute, holding that the "child who resides in another State" element is only a jurisdictional hook, relying upon *Monts* and *Lewko*. Both of these courts, however, addressed only the constitutionality of the CSRA as an exercise of Congress' commerce power, holding that proof of the out-of-state residence of the child was sufficient to confer federal jurisdiction. *See Monts*, 311 F.3d at 997; *Lewko*, 269 F.3d at 68. Neither court addressed the separate question – raised here – whether defendant's knowledge of the child's out-of-state residence is required for conviction under the statute, because in neither *Monts* nor *Lewko* was this issue presented.[3]

The Supreme Court has made clear, however, that a jurisdictional element may be more than"merely jurisdictional." In examining the federal statute criminalizing assault on a federal officer, the Court noted that a jurisdictional element may require proof that "the existence of the fact that confers federal

---

[3]In both these cases, the non-paying parent knew the child resided out-of-state. *Monts*, 311 F.3d at 995; *Lewko*, 269 F.3d at 65-66.

jurisdiction . . . be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Feola*, 420 U.S. at 677. In deciding whether the assault statute requires proof not only that the victim was a federal officer (the fact conferring federal jurisdiction), but also that the defendant knew this fact, the Court said that labeling the federal agent element "jurisdictional" begs the question whether "it is jurisdictional *only*." 420 U.S. at 678 (emphasis added).

The issue, then, with respect to the proper interpretation of the CSRA is whether its jurisdictional element is jurisdictional *only*; or does the statute's requirement for willfulness apply to this element, mandating that the existence of the fact that confers federal jurisdiction – the child's out-of-state residence – be in the mind of the CSRA defendant when he fails to pay his past-due child support obligation.[4]

The answer cannot be found in the language of the statute. The CSRA criminalizes a willful failure to pay a support obligation with respect to a child who resides in another state. Whether the requirement for "willfulness" applies only to the "failure to pay," or whether it also applies to the "child who resides out

---

[4]Although citing *Feola*, the district court appears to have concluded that *Mont* and *Lewko* resolved all issues in the case.

of state" element, is not apparent on the face of the statute.

In reviewing a similarly-worded statute, the Supreme Court noted that the scope of an adverb dictating the requisite intent that is followed by multiple elements of the offense is virtually always ambiguous. *Liparota v. United States*, 471 U.S. 419, 425 n.7 (1985) ("'As a matter of grammar the statute is ambiguous; it is not at all clear how far down the sentence the word 'knowingly' is intended to travel – whether it modifies "sells," "sells a security," or "sells a security without a permit.'") (quoting W. LaFave & A. Scott, Criminal Law § 27 (1972)). In *United States v. Hayes Int'l Corp.*, we relied upon *Liparota* to find a similarly-worded statute ambiguous. 786 F.2d 1499, 1502 (11th Cir. 1986).

In the absence of any plain meaning of the statutory language, we look to the legislative history of the statute to determine whether Congress provided any guidance concerning its intent. *See Liparota*, 471 U.S. at 424 ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute"). For example, in *Feola*, the federal assault statute contained no strict scienter requirement indicating whether the element conferring federal jurisdiction – the federal status of the officer assaulted – need be known by the defendant at the time of the assault. 420 U.S. at 678-79. In considering the issue, the Court wrote:

If the primary purpose is to protect federal law enforcement personnel, that purpose could well be frustrated by the imposition of a strict scienter requirement. On the other hand, if [the statute] is seen primarily as an anti-obstruction statute, it is likely that Congress intended criminal liability to be imposed only when a person acted with the specific intent to impede enforcement activities. Otherwise, it has been said: 'Were knowledge not required in obstruction of justice offenses described by these terms, wholly innocent (or even socially desirable) behavior could be transformed into a felony by the wholly fortuitous circumstance of the concealed identity of the person resisted.'

*Id.*

After examining the statute's legislative history, the Court concluded that Congress intended the statute to protect both federal officers and federal functions, and that interpreting the statute *not* to have a "strict scienter" requirement would be consistent with both purposes. *Id.* at 679.

With respect to the CSRA, however, Congress not only included a "strict scienter" requirement in the statute by the insertion of the "willfully" element, but expressly stated its intention that conviction under the statute require the same sort of specific intent to commit the crime that is required for conviction under a tax statute. *See* H.R. Rep. No. 102-77, at 6 (1992) (citations omitted). The House Report states that the CSRA's "willfully fails to pay" language was "borrowed from the tax statutes that make willful failure to collect or pay taxes a Federal crime," and that "the willful failure standard of [the CSRA] should be interpreted

8

in the same manner that Federal courts have interpreted these felony tax provisions." *Id.*

The House Report specifically cites *United States v. Birkenstock*, 823 F.2d 1026, 1028 (7ᵗʰ Cir. 1987) as illustrative of the sort of scienter it intended the CSRA's "willful" element to require. In *Birkenstock*, the Seventh Circuit held that the federal tax statutes are specific intent crimes, requiring for conviction not only that the defendant intended the *act* charged, but also that he intended to *violate the law*. 823 F.2d at 1028. The court said that "[t]he willfulness element . . . requires proof of an 'intentional violation of a known legal duty.'" *Id.* (quoting *United States v. Pomponio*, 429 U.S. 10, 12 (1976)).[5]

But what is the legal duty imposed by the CSRA that must be known to the defendant? The government argues that the legal duty Fields violated – undisputedly known to him – was to pay the state court-ordered child support

---

[5]In consulting this legislative history to assist us in ascertaining congressional intention behind the insertion into the CSRA of the "willful" element, we do not mean to abdicate our judicial duty to determine "what the statute itself says," as Judge Carnes' emphasizes in his concurrence. We find nothing with which to disagree in the concurrence; but find the concern expressed there to be inapplicable to the case before us, in which the committee report "explicitly recognizes and addresses [the] interpretive problem" at issue, and there is no indication in the legislative history that "the report is not a reliable indicator of congressional intent." In such a case, we may consider the report in reaching our conclusions about congressional intent. *See Feola*, 420 U.S. at 680-81 (relying upon a committee report consisting almost in its entirety of a letter from the Attorney General to the Chairman of the Senate Committee on the Judiciary urging passage of the federal assault statute and stating that it was "needed for the protection of Federal officers and employees").

obligation. There is no doubt that this knowledge is required, and we have previously so held. *See Brand*, 163 F.3d at 1275 ("the plain language of the state court order was therefore sufficient to charge Brand with knowledge of his duty to pay"). *See also United States v. Mathes*, 151 F.3d 251, 255 (5th Cir. 1998) (knowledge of duty to pay element of crime); *United States v. Crawford*, 115 F.3d 1397 (8th Cir. 1997) (sufficient evidence that Crawford knew he was required to make support payments pursuant to court order). In none of these cases, however, did the defendant contend that, in addition to knowing he had a duty to pay support to his child, he also had to know that he had a duty to a child who resided in another state.[6] This is what Fields contends – that the legal duty imposed by the CSRA that must be known to him is to pay the child who resides in another state.

The question, then, is whether the CSRA imposes a legal duty to pay a child support obligation – as the government contends – or whether it imposes a legal duty to pay a child support obligation to a child who resides in another state? So

---

[6]In most of these cases, it is the non-paying parent who has left the jurisdiction of the court-ordered obligation. In fact, the ability to enforce state-ordered support obligations across state lines to reach the "deadbeat dad" who has fled the jurisdiction was the impetus for the statute. *See* Deadbeat Parents Punishment Act, 18 U.S.C. § 228(a)(3). *See United States v. Hopper*, 899 F. Supp. 389, 394 (S.D. Ind. 1995) ("It appears that the CSRA was aimed at providing a tool for enforcement authorities to prosecute 'runaway' parents who flee a jurisdiction to avoid state enforcement of child support obligations"). The statute has been held, however, to apply equally to the case where the child leaves the jurisdiction of the state-ordered obligation. *Id. See also United States v. Mussari*, 95 F.3d 787, 790 (9th Cir. 1996).

10

put, the answer is obvious. The state court orders the child support obligation. No federal court can do so. Congress may criminalize the failure to perform that state-ordered obligation when, and *only* when, the child resides in another state. In enacting the CSRA, Congress created a *new* legal duty – the duty to pay when the child resides out of state – and criminalizes the failure to do so. Since Congress has indicated that, like the tax laws, it intended the CSRA to punish only the violation of a *known* legal duty, we conclude that, in order to prove a willful violation of the statute, the government must prove that the defendant knew his child resided in another state and he refused to pay.

This interpretation of the statute finds support in *Bryan v. United States*, 524 U.S.184, 194 (1998), in which the Supreme Court clarified the requisite *mens rea* to satisfy a non-tax statute containing a willfulness element. The Court first said that, unlike the more technical tax laws, knowledge of the specific *statute* may not be necessary to prove its willful violation. *Id.* at 194-95. *Always* required, however, is "knowledge of the facts that constitute the offense." *Id.* at 193. Unless the defendant has knowledge of the facts constituting the offense, he cannot be said to have acted with the requisite willfulness to violate the law. *Id.* at 196. *See Morisette v. United States*, 342 U.S. 246, 271 (1952) (willfulness requires knowledge of the facts, though not necessarily the law, that made the

11

conduct a crime). In this case, it is assumed that Fields did not know that his child resided in another state. Therefore, he did not have knowledge of the facts constituting the offense and could not have had the requisite willfulness to support his conviction.

This conclusion is buttressed by the fact that Fields' failure to pay his child support obligation was not a crime at all in the state that ordered it – Georgia. Georgia has not criminalized such a failure. Therefore, the only crime Fields may have committed was a newly-created federal one, which he had no way of knowing he was committing unless he knew that his child resided out of state.[7]

The "danger of ensnaring individuals engaged in apparently innocent conduct," is exactly the reason that *knowledge* of a legal duty imposed by the tax code is required in order to convict the felony tax defendant. *Bryan*, 524 U.S. at 194. It is also a danger recognized by the Court in *Feola*. As the Court said there, without a scienter requirement, "wholly innocent behavior" can be "transformed into a felony by [a] wholly fortuitous circumstance" – in this case, the removal of the child from the state by the custodial parent. While it is true that the failure to

_____

[7]This is not to say that Fields had to have knowledge of the CSRA statute itself. In rejecting this argument, the Second Circuit has held that, unlike many tax statutes, knowledge of the specific statute is not required for conviction under the CSRA. *United States v. Mattice*, 186 F.3d 219, 226 (2d Cir. 1999). While we express no opinion on this issue, we note that it is distinct from the question of whether knowledge of the child's out-of- state residence is required and was not addressed in *Mattice*.

12

pay child support is not "innocent" conduct, nor is it *criminal* conduct in Georgia. This Georgia civil obligation becomes a federal crime only when the custodial parent moves, secretly or openly, to another state. Holland removed this child from Georgia after some support payments were past due. This removal was neither Fields' doing, nor known to him – indeed, as the magistrate found, the removal was hidden from him. Nonetheless, Holland's removal of the child from Georgia *caused* Fields' prior conduct to become criminal. In such circumstances, it cannot be said that his violation of the statute was willful, and the statute must not be interpreted to permit such a result.

### III.

The district court upheld Fields' conviction because it interpreted the CSRA to permit his conviction without his knowledge of the out-of-state residence of the child to whom support is owed. Because we hold that the statute requires such knowledge, we reverse the judgment of the district court and reverse Fields' conviction.

**REVERSED.**

CARNES, Circuit Judge, concurring:

I join the judgment of this Court and all of the majority's opinion, except its statements equating a committee of the House of Representatives with the entire Congress. In one place the opinion says that Congress "expressly stated its intention" about the willfulness requirement of the Child Support Recovery Act in the report of the House Judiciary Committee about that legislation. Maj. Op. at 8. In another place the opinion refers to what "Congress has indicated" and it does so in a way that appears to equate the House Judiciary Committee with Congress. Maj. Op. at 10–11.

No committee of either house of Congress is the whole of it, and no committee of either house speaks for the legislative branch or all of its members, or even for a majority of them. The reports of committees are not instructions or statements from Congress. They are not part of the law. When the meaning of a statute is unclear and resort to the usual canons of construction do not solve the interpretative problem, courts sometimes consult congressional committee reports for some evidence of the meaning of the problematic language. That we do so is a reflection of our desire to consider all possible sources of information; it is not a testament of the reliability of committee reports as indicators of the intent of the whole legislative body.

14

For one thing, there often will not be a common congressional intent behind ambiguous language. The problem with a statute's wording and the issue that wording presents may not have been recognized and brought up for discussion while the bill was being considered, or the language may have been deliberately engineered for ambiguity in order to paper over disagreement about an issue. Even when a committee report explicitly recognizes and addresses an interpretative problem, the report is not always a reliable indicator of congressional intent. In the best case scenario a committee report may indicate what a majority of that committee's members thought about a particular issue that was less than artfully addressed in the bill itself, but in many cases the report indicates only what a few members, or some staffers, or some lobbyists, thought or wished the bill said.

For an illustration of why we should not view committee reports as instructions from Congress, one can hardly do better than this enlightening exchange between two Senators, quoted in an opinion that Justice Scalia wrote when he was on the D.C. Circuit Court of Appeals:

> Mr. ARMSTRONG. . . . My question, which may take [the chairman of the Committee on Finance] by surprise, is this: Is it the intention of the chairman that the Internal Revenue Service and the Tax Court and other courts take guidance as to the intention of Congress from the committee report which accompanies this bill?

15

Mr. DOLE. I would certainly hope so. . . .

Mr. ARMSTRONG. Mr. President, will the Senator tell me whether or not he wrote the committee report?

Mr. DOLE. Did I write the committee report?

Mr. ARMSTRONG. Yes.

Mr. DOLE. No; the Senator from Kansas did not write the committee report.

Mr. ARMSTRONG. Did any Senator write the committee report?

Mr. DOLE. I have to check.

Mr. ARMSTRONG. Does the Senator know of any Senator who wrote the committee report?

Mr. DOLE. I might be able to identify one, but I would have to search. I was here all during the time it was written, I might say, and worked carefully with the staff as they worked. . . .

Mr. ARMSTRONG. Mr. President, has the Senator from Kansas, the chairman of the Finance Committee, read the committee report in its entirety?

Mr. DOLE. I am working on it. It is not a bestseller, but I am working on it.

Mr. ARMSTRONG. Mr. President, did members of the Finance Committee vote on the committee report?

Mr. DOLE. No.

Mr. ARMSTRONG. Mr. President, the reason I raise the issue is not

16

> perhaps apparent on the surface, and let me just state it: . . . . The
> report itself is not considered by the Committee on Finance. It was
> not subject to amendment by the Committee on Finance. It is not
> subject to amendment now by the Senate.
>
>     . . . .
>
> . . . If there were matter within this report which was disagreed to by
> the Senator from Colorado or even by a majority of all Senators, there
> would be no way for us to change the report. I could not offer an
> amendment tonight to amend the committee report.
>
> . . . [F]or any jurist, administrator, bureaucrat, tax practitioner, or
> others who might chance upon the written record of this proceeding,
> let me just make the point that this is not the law, it was not voted on,
> it is not subject to amendment, and we should discipline ourselves to
> the task of expressing congressional intent in the statute.

Hirschey v. F.E.R.C. , 777 F.2d 1, 7 n.1 (D.C. Cir. 1985) (Scalia, J., concurring) (quoting 128 Cong. Rec. S8659 (daily ed. July 19, 1982)) (alterations in original).

We should never forget that the law is what the statute itself says after it is approved by both houses of the legislature and signed by the President. Aldridge v. Williams, 44 U.S. (3 How.) 9, 24 (1845) ("The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself . . . ."). Committee reports are not voted on by the house in which they originate, much less by the other house; they are not statements from Congress as a whole; they are not signed into law by the President; they are not the law.